**Allen W. HEUSTESS, Appellant,**

v.

**Bonnie J. KELLEY–HEUSTESS, Appellee.**

No. S–12126.

Supreme Court of Alaska.

May 25, 2007.

Phyllis A. Shepherd, Law Office of Dan Allan and Associates, Anchorage, for Appellant.

D. Scott Dattan, Law Office of D. Scott Dattan, Anchorage, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

MATTHEWS, Justice.

This divorce case presents issues relating to the division of property and child support. We vacate the property division, primarily because it was premised on decisions that transmuted only a portion of the marital house into marital property and valued the house at the time of separation rather than the time of trial. We also vacate the award of child support for the period before the parties married because appellant did not have a fair opportunity to present defenses to this claim.

## I. FACTS AND PROCEEDINGS

In 1991 Bonnie Kelley and Allen Heustess had a child. At the time Bonnie and Allen did not live together, and Allen did not financially support their child. In 1993 Bonnie purchased a house in Chugiak and lived there with their child and her two children by a prior relationship. Allen moved in with them in 1997 and began turning over his paycheck to Bonnie for deposit into her

checking account for general use.[1] Allen and Bonnie married on June 26, 1999.

In 2002 Bonnie was seriously injured in an automobile/motorcycle collision. Bonnie settled with the automobile driver's insurer for gross settlement proceeds of $10,000 to replace her destroyed motorcycle and $118,532 for her personal injuries.

On October 23, 2002, the parties refinanced the Chugiak house. At that time the house was valued at $200,000 and was subject to a mortgage of $113,273. The principal amount of the new loan was $160,000. The loan proceeds were mainly used to pay off the old loan on the house and loans on various items of marital property. In particular, $11,000 was used to pay a loan on a motorcycle owned by the parties and primarily used by Allen, $20,412 was used to pay off a loan on a Chevy Blazer owned by the parties and used by Bonnie, $9,000 was used to pay off land in Palmer that was marital property, and the remaining proceeds were used to pay off some debts. At the time of the refinance Allen's name was added to the title to the house and he became a co-borrower on the new note. Shortly after the refinancing the parties separated. The trial court set the date of separation as October 31, 2002. Since the separation Bonnie has made all of the payments on the new note.

Bonnie initially filed for divorce in 2003 but dismissed the case. She filed again on October 27, 2004. Bonnie was granted primary interim physical custody of their child. The superior court ordered Allen to pay interim child support prospectively at the rate of $512 a month and calculated Allen's arrearages since the parties' separation at $12,414.

Allen is a truck driver; he was forty-four years of age at the time of trial. He reported gross annual wages of $46,295 for 2004. At the time of trial Bonnie was forty-nine years of age and was working as a waitress. Her gross wages as reported on her 2004 return were $32,900.

The case was tried on July 22 and 25, 2005. At the conclusion of the trial the court an-

nounced its decision and subsequently entered written findings of fact and conclusions of law.

The court found that the home was only partially transmuted into marital property. Specifically, the court concluded that the home was two-thirds the separate property of Bonnie and one-third marital property. The court also decided to value the Chugiak home as of the time of the parties' separation, rather than the time of trial.

The court determined that the marital estate had a net value of $98,683 and distributed it as follows:

| | | Allen | Bonnie |
|---|---|---|---|
| undistributed marital equity at the time of separation in Chugiak house | $16,528 | $ 8,264 | $ 8,264 |
| value of Palmer land | $22,500 | $22,500 | |
| net value of vehicles awarded to Allen | $41,855 | $41,855 | |
| net value of vehicles awarded to Bonnie | $15,300 | | $15,300 |
| hot tub | $ 2,500 | $ 2,500 | |
| Total | $98,683 | $75,119 | $23,564 |

The court decided that a sixty/forty division in favor of Bonnie was justified and that Bonnie should receive assets of $59,210 from the marital estate. Since she actually received $23,564, the court ordered Allen to pay her the difference, $35,646.

The court awarded custody of their child to Bonnie and reaffirmed both the prior award of arrearages accrued since the parties' separation and Allen's previously set obligation to pay monthly child support. During her rebuttal testimony Bonnie was asked whether Allen had paid child support for the child "from 1991 to 1997." After she answered in the negative she was asked whether "that should be taken into account here as well" and she answered in the affirmative. At final argument, Bonnie's counsel then claimed premarital child support for their child. This subject was not mentioned in her trial brief or in any pre-trial pleadings and was raised for the first time in her rebuttal testimony. The court concluded that such an

---

1. This practice ended a month before the parties separated. Bonnie testified that Allen "started

holding his checks" in September of 2002.

award should be made and ordered that Child Support Services Division be required to calculate arrearages owed between the child's date of birth in December of 1991 and the parties' marriage in June of 1999.

The court also awarded Bonnie $10,000 in attorney's fees, finding that some of the work that her counsel was required to do was necessitated by Allen's "vexatious and unreasonable conduct." The court also noted that it had considered "the parties' relative economic circumstances, and the fact that plaintiff bore most of the burden of supporting [the child] while defendant failed to pay interim child support contrary to the court's order."

## II. DISCUSSION

### A. Standard of Review

"Equitable allocation of property is reviewable under an abuse of discretion standard and will not be reversed unless it is clearly unjust." [2] This court reviews legal determinations relevant to property division and child support based on an independent judgment standard.[3] Factual determinations made by the superior court are reviewed deferentially under the clearly erroneous standard.[4]

### B. Partial Transmutation of the House Was Improper.

■ The trial court found that the Chugiak house, originally owned by Bonnie, was transmuted into marital property between the parties' marriage in June of 1999 and the parties' separation at the end of October of 2002. The court stated in its oral findings:

I agree with Ms. Shepherd [Allen's attorney] that in June of 1999, because of the contribution of money and effort ... by

Mr. Heustess to the home and the fact that he lived there with Ms. Kelley–Heustess and used it as a marital residence, and from the apparent intent of the parties to treat it as their marital residence, that from June of 1999 until October of 2002 the home was marital property.

But the court went on to conclude that only one-third of the value of the house was transmuted. The court reached this conclusion for two reasons. First, it found only one-third of the house's value was transmuted because Bonnie had owned the house for nine years as of the time of separation and Allen only occupied the house as her husband for three of those years.[5] Second, the court found that Allen had deceived Bonnie with respect to the October 2002 refinancing because he did not tell her that he was about to separate. The court found that the refinancing proceeds were used in large part for Allen's benefit.

Neither of these reasons justifies a partial transmutation of the house. We have repeatedly indicated that transmutation of real estate converts the entire property from separate to marital in character. In *Miller v. Miller,*[6] *Lundquist v. Lundquist,*[7] and *Compton v. Compton*[8] we rejected theories of partial transmutation apportioned according to ratios like those used by the superior court in this case.

The rationale based on Allen's deception is also not persuasive. If transmutation turned on the fact that Allen obtained title as a result of the refinancing there could be merit to this theory. But, as the court made clear, it was Allen's contributions and effort in maintaining and improving the house and the parties' intent before the refinancing that brought about the transmutation. Moreover, with the exception of $1,400 that the court

2. *Green v. Green,* 29 P.3d 854, 857 (Alaska 2001) (quotations omitted).

3. *Caldwell v. State, Dep't of Revenue, Child Support Enforcement Div.,* 105 P.3d 570, 573 (Alaska 2005); *Schmitz v. Schmitz,* 88 P.3d 1116, 1122 (Alaska 2004).

4. *Caldwell,* 105 P.3d at 573; *Schmitz,* 88 P.3d at 1122.

5. The court ignored the two-year period of premarital cohabitation during which Allen lived in

the house. Our case law permits such periods to be considered in deciding transmutation questions. *See Abood v. Abood,* 119 P.3d 980, 988 (Alaska 2005).

6. 105 P.3d 1136, 1141 (Alaska 2005).

7. 923 P.2d 42, 48 (Alaska 1996).

8. 902 P.2d 805, 812 (Alaska 1995).

found went to pay a pre-existing debt of Allen's, all of the proceeds of the refinancing were used for marital purposes—mainly to pay debts on marital property. Thus, apart from the $1,400 debt, the refinancing did not convert the house equity into separate property. The new loan mainly replaced high-interest consumer debt on marital property with low-interest real estate debt.[9] Allen's deception was not shown to be financially harmful and cannot under any recognized legal theory justify a defeasance of two-thirds of his share of the Chugiak house.

### C. It Was Error To Value the House as of the Parties' Separation.

■ When the parties separated the value of the house was $200,000. By the time of trial the house had appreciated. An appraisal indicated that it was worth $230,000. By valuing the house as of 2002 the court deprived Allen of any interest in this appreciation.

The trial court recognized the general rule that property should ordinarily be valued at the time of trial. But the court decided that the circumstances of this case justified a deviation from this rule for three reasons. First, the court noted that the parties ceased functioning as an economic unit at the time of separation. Second, the court noted that there was an appraisal as of the time of separation. And third, the court relied on Allen's deceptive conduct in failing to reveal to Bonnie that he intended to leave her at the time the house was refinanced.

We adopted the rule that valuation should be conducted as close as practicable to the date of trial in *Ogard v. Ogard.*[10] In so doing we rejected a valuation date linked to the time of separation, quoting the following language from a leading commentator:

A valuation date should be chosen which will provide the most current and accurate information possible and which avoids inequitable results. It is distinct from the date marking the termination point for inclusion of property within equitable distribution. The latter date marks the end of the marital *team* effort. Since this date may be well in advance of the dissolution proceedings, a valuation date linked to it may result in stale financial information.[11]

We also observed that

there may be special situations in which the date of separation is more appropriate. Where, for example, "one of the spouses dissipates assets or deliberately allows their value to decline following separation, or the value of marital property increases due to the efforts of one of the spouses," use of the separation date may be warranted. In that event, there should be specific findings as to why the date of separation is the more appropriate choice for valuation.[12]

In the present case the three reasons for choosing the earlier valuation date are unpersuasive. The fact that the parties ceased operating as an economic unit merely marks the date of separation and is not a reason for valuing marital property at the date of separation. The fact that an appraisal of the house was made at the date of separation is irrelevant both because a 2005 appraisal was also made and because the 2002 appraisal is just the sort of "stale financial information" that the time of trial rule is meant to eschew.[13] As far as the deceptive conduct of Allen is concerned, as already indicated, this conduct does not justify defeasing a part of Allen's interest in the house, including his interest in its appreciation.

9. Bonnie testified that her house payments increased from $1,100 each month to $1,400 per month following the refinance. But the monthly payments eliminated because of the other loans paid off by the refinance proceeds must be considered when evaluating the impact of the refinance, and there is no indication that this was done.

10. 808 P.2d 815, 819 (Alaska 1991).

11. *Id.* at 819 (quoting L. GOLDEN, EQUITABLE DISTRIBUTION OF PROPERTY § 7.01, at 207 (1983)) (citations and footnotes omitted in original).

12. *Id.* at 820 (quoting GOLDEN, *supra* note 11, § 7.02, at 208).

13. *Id.* at 819 (quoting GOLDEN, *supra* note 11, § 7.01, at 207).

## D. Remedy on Remand Regarding the House

For the reasons stated in the preceding parts, it was error to decide that the house was only partly transmuted and to value it as of the time of separation rather than at the time of trial. These errors require that the property division be vacated so that they may be corrected. In the process the court should consider whether Bonnie should be given credit for post-separation mortgage payments she made from separate property and whether any such credits should be offset by the value of the benefit of her post-separation occupancy of the house.[14]

## E. The 60/40 Division

Alaska Statute 25.24.160(a)(4) requires trial courts to consider specific factors in dividing property. When dividing a marital estate, "the trial court generally should begin with the presumption that an equal division of marital property is most equitable."[15]

In the present case, the trial court decided to deviate from the 50/50 norm. The trial court gave four reasons for this deviation. First, the court cited the differential in the parties' earning power. Allen had earned $46,295 in 2004 whereas Bonnie had earned $32,900. Second, the court cited the age differential between the parties and noted that Bonnie had lingering physical disabilities from the accident. Third, the court cited Allen's deception in failing to tell Bonnie that he was about to leave when the house was refinanced. Fourth, the court found that Allen's failure to pay interim child support as ordered by the court added to Bonnie's difficult financial circumstances.

Allen challenges the 60/40 division on the ground that Bonnie has better occupational prospects than the court found, that the court erred in relying on Allen's deceptive conduct at the time of the refinancing of the house, and that the court failed to take into account rental income that Bonnie was earning at the time of trial from renting an apartment encompassed within the Chugiak house.

Allen's first point is without merit. The record shows that Allen is healthier and has greater earning capacity than Bonnie. Bonnie's injuries will probably require more medical care, and they limit her future employment options.[16]

Allen's second point is correct. It was error to find that the refinancing of the house was a source of financial detriment for the reasons already explained.

Allen's third point is also correct. At the time of trial, Bonnie was earning some $650 per month in rental revenue from renting an apartment contained in the house. The court did not consider this source of income in deciding on the 60/40 property division.

The errors with respect to the effect of the refinancing and failing to consider the rental income do not necessarily mean that the 60/40 property division is not justified. On remand, the court should reconsider whether and to what extent an unequal division of the parties' assets should be made in view of the rental income available to Bonnie and without weighting the scale against Allen because

---

14. The need to consider whether credits—and offsets—should be given for post-separation mortgage payments is reflected in our case law. *See Korn v. Korn*, 46 P.3d 1021, 1023–24 (Alaska 2002) (noting that this court has approved both crediting "a spouse for making payments of post-separation income to preserve marital property," and offsetting "this credit, since 'any benefit [the spouse] may have imparted to the marital estate was offset by the benefit he received from the estate by living rent free' ") (quoting *Rodriguez v. Rodriguez*, 908 P.2d 1007, 1013 (Alaska 1995)). *See also Carr v. Carr*, 152 P.3d 450, 454 (Alaska 2007) ("The superior court may impute the rental value of one party's exclusive use of the marital residence after separation to that party when it equitably divides the marital estate between parties."); *Ramsey v. Ramsey*, 834 P.2d 807, 809 (Alaska 1992) ("We have required that trial courts consider payments made to maintain marital property from post-separation income when dividing marital property. We have not, however, held that the spouse who makes such payments must necessarily be given credit for them in the final property division.").

15. *Fortson v. Fortson*, 131 P.3d 451, 456 (Alaska 2006) (quotation omitted).

16. Bonnie testified that her injuries will prevent continued employment as a waitress.

of his deception at the time of the refinancing transaction.

## F. Other Property Issues

### 1. Furnishings and household property

■ Allen argues that the trial court erred in failing to credit Bonnie with $50,000 in furnishings and personal property left in the home at the time of separation. As his only evidence for this value, Allen cites Bonnie's refinancing application, in which Bonnie stated that she had $50,000 in "furniture and personal property."

Refusing to rely upon this value was not clear error. Bonnie's uncontroverted testimony established that she significantly exaggerated that figure on her refinancing statement to obtain the loan. Belying his $50,000 estimate, Allen's financial statement claimed that the total value of personal marital property was well below $50,000, and the trial court found that even these values were not credible because Allen used purchase price rather than fair market values. Further, the court concluded that Allen took about as much household property as he left and that the split of the items in question was "a wash." Allen has not shown that this determination is clearly erroneous.

### 2. The negative value for the Blazer

■ More persuasive is Allen's argument regarding Bonnie's Chevy Blazer. The trial court's findings concerning Bonnie's vehicles were that "[p]laintiff owns a 2002 Harley at $23,000 and a 2001 Ford Sports Track which has negative value because of the Blazer at ($7,700) for a total in her column of $15,300." Allen argues that because Bonnie paid the Blazer debt with the refinancing proceeds the superior court clearly erred by treating the Blazer as a liability.

The facts show that the loan on the Chevy Blazer, a marital vehicle, was completely paid off by application of $20,412 from the refinancing proceeds. Bonnie used the Blazer for some time after the separation and then traded it in for a Ford Sports Track. She received trade-in credit for the Blazer of some $13,000. The court should have traced this marital contribution, less pro-rated depreciation, to the Sports Track and added it to Bonnie's vehicle account.[17] It follows that finding the Chevy Blazer had a negative value, when in fact nothing was owed on it at the time that it was traded in, was error, as was deducting $7,700 on account of the Blazer from Bonnie's vehicle account.

### 3. Account balances as of September 2002

■ Allen claims that the court erred in failing to credit Bonnie with the $10,946 in the checking and savings accounts as of September 30, 2002, the day that Allen stopped depositing his paychecks into the parties' mutual account. He notes that the court found that these amounts were later reasonably used for living expenses by Bonnie and her children. Allen argues that unless he receives some credit for his share of these funds, Bonnie is receiving a double recovery in light of the child support arrearages with which he has been charged for the same period. In our view this argument lacks merit because the child support Allen should have paid was not intended for Bonnie's support nor was it meant to supply all of the support reasonably needed by their child. Thus, Bonnie's use of the funds in the account for support and her anticipated receipt of the child support arrearages do not amount to a double recovery.

### 4. The settlement funds

■ Allen also argues that the court erred in failing to characterize a part of the personal injury settlement received by Bonnie and the property damage settlement of $10,000 for the destroyed motorcycle as marital. This argument is irrelevant in view of the court's finding that the marital funds Bonnie retained at the time of separation were later reasonably expended by Bonnie to support herself and her children. As of the time of the trial the funds did not exist. Since they

---

17. *See Hunt v. Hunt,* 698 P.2d 1168, 1171 (Alaska 1985) ("Property acquired after the permanent separation but prior to final divorce should be included in the property settlement if it was acquired with property which would otherwise have been subject to division.").

had not been squandered by Bonnie there was no occasion to attempt to recapture them.[18]

### G. Granting Premarital Child Support Violated Allen's Right to Due Process.

■ Pursuant to a request that Bonnie made for the first time in her rebuttal testimony, the superior court ordered Allen to pay Bonnie child support for the period before the Heustesses' marriage, during which Allen failed to support their child. Allen asserts that by adjudicating a claim Bonnie did not raise until late in the trial, the superior court denied Allen due process.

■■ Due process requires that a party be provided with notice and an opportunity for a hearing on issues of consequence.[19] The notice must be sufficiently early and specific to allow the party to prepare and present a defense.[20] Here, Allen first received notice of Bonnie's claim for pre-marriage child support at a time when it was not possible to effectively contest this claim.[21] Since Allen lacked notice and an opportunity to be heard on this issue, the superior court's order for pre-marriage child support must be vacated.

### H. Attorney's Fees

■ The purpose of awarding attorney's fees in divorce cases is to allow the parties to litigate on an equal plane, and awards are accordingly based on the parties' relative economic circumstances.[22] The superior court may also increase an award of fees where a party has engaged in bad faith or vexatious litigation.[23] When "making an increased fee award, the court must first determine what fee award would be appropriate under the general rule, and only then increase the award to account for a party's misconduct. Failure to follow this two-step process constitutes an abuse of discretion." [24] In addition, "[w]hen the court finds that one spouse's misconduct has unnecessarily increased the other spouse's costs, the court must identify the nature and amount of these increased costs." [25]

In the present case the court awarded Bonnie $10,000 in attorney's fees based both on the parties' relative economic circumstances and Allen's vexatious and unreasonable conduct.[26]

Because the property division must be vacated, the economic conditions on which the court based its award of attorney's fees may change on remand. It is therefore appropriate to vacate the attorney's fee award. Further, it is impossible to tell to what extent

18. See *Jones v. Jones,* 942 P.2d 1133, 1139 (Alaska 1997) ("When . . . [an] expended marital asset was wasted, or converted to a nonmarital form, the trial court may recapture the asset by giving it an earlier valuation date and crediting all or part of it to the account of the party who controlled the asset.") (quotations omitted).

19. *Carvalho v. Carvalho,* 838 P.2d 259, 262, 263 (Alaska 1992) (holding that the trial court violated a parent's due process rights by rejecting his request to testify in a child support hearing); *cf. Walker v. Walker,* 960 P.2d 620, 621–22 (Alaska 1998) ("[T]he notice and hearing afforded a litigant in child custody proceedings involves due process considerations.") (quotations omitted).

20. See *Crutchfield v. State,* 627 P.2d 196, 199 (Alaska 1980) (holding that procedural due process requires the government to give notice to individuals whose property interests are adversely affected by government action); *Aguchak v. Montgomery Ward Co.,* 520 P.2d 1352, 1356 (Alaska 1974) (holding that due process requires notice of a hearing sufficient to convey information required to present objections).

21. We note that in her late request for premarital child support Bonnie did not ask for support between the beginning of cohabitation in 1997 and the parties' marriage. The trial court, however, directed that arrearages be awarded to the time of the marriage.

22. *Lone Wolf v. Lone Wolf,* 741 P.2d 1187, 1192 (Alaska 1987).

23. *Kowalski v. Kowalski,* 806 P.2d 1368, 1373 (Alaska 1991).

24. *Id.*

25. *Id.*

26. The court also noted that Bonnie "bore most of the burden of supporting [the child] while [Allen] failed to pay interim child support contrary to the court's order." Allen's failure to pay interim child support is relevant to Bonnie's economic circumstances.

the award was made because of Allen's vexatious conduct. Since the portion of the award based on such conduct must be vacated for the reasons explained in the following paragraph, and we do not know what this portion is, this is an additional reason for vacating the entire award. The trial court should entertain fresh fee requests based on the parties' economic circumstances following the court's decision on remand.

Insofar as the attorney's fee award was based on vexatious litigation conduct on the part of Allen, an increased award of fees may be justified on remand. But the present award may not be affirmed on that basis because the court did not follow the two-step process referred to above and did not identify the increased costs that were the product of Allen's vexatious conduct.

## III. CONCLUSION

The order dividing the parties' property must be vacated. The trial court on remand should divide the parties' property in accordance with the views expressed in this opinion. In making this division, the court should bear in mind that "[t]he preferred method for dividing a marital estate is to transfer title where this can be reasonably accomplished, but it is not error per se to make a cash award requiring one party to sell illiquid assets (or make installment payments) where such an award causes no hardship."[27] On remand therefore the court should also address whether an equitable division can reasonably be accomplished solely by transferring property and whether Allen can, without hardship, make a cash payment as part of the property division.[28]

The court's order awarding child support arrearages between the child's birth and the parties' marriage must also be vacated. On remand the court should give Allen an opportunity to present such defenses as he may have with respect to the claim of child support for this period.

The award of attorney's fees is also vacated. The questions of whether to award attorney's fees and if so how much should be

addressed at the conclusion of the proceedings on remand.

The court is authorized to conduct supplemental evidentiary proceedings on remand if the court in its discretion finds such proceedings to be desirable.

VACATED and REMANDED for further proceedings.

---

**27.** *Cox v. Cox,* 931 P.2d 1041, 1045 (Alaska 1997).

