*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| VERONICA LOUISE HUDSON, | ) | |
| | ) | Supreme Court No. S-18242 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-20-01685 CI |
| v. | ) | |
| | ) | O P I N I O N |
| DANIEL LEE HUDSON, | ) | |
| | ) | No. 7665 – July 7, 2023 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Brent E. Bennett, Judge.

Appearances: Eric K. Ringstad, Golden Heart Law, LLC, Fairbanks, for Appellant. Jason A. Weiner, Jason Weiner & Associates, P.C., Fairbanks, for Appellee.

Before: Maassen, Chief Justice, Carney, Borghesan, and Henderson, Justices.

HENDERSON, Justice.

## I. INTRODUCTION

A former wife appeals several aspects of the division of property in her divorce. The couple separated in June 2020, after the wife left Alaska without telling her husband. Soon after separation, the husband received a large severance and bonus package. On appeal the wife challenges the superior court's determination that the husband's severance and bonus pay were separate property. She further challenges the superior court's division of the marital estate, contending that the court erred both in

concluding that her concealment of her plans to separate amounted to economic misconduct, and in finding that the parties' respective financial conditions were equal. Finally, she challenges the court's order allowing the husband to make an equalization payment over five years rather than in a lump sum, as well as the court's denial of her request for attorney's fees.

We conclude that the court lacked sufficient information to classify the severance and bonus pay, and clearly erred in its findings related to economic misconduct and the financial condition of the parties. We further conclude that the court abused its discretion in ordering a schedule of equalization payments over multiple years under the circumstances. We remand for further proceedings to determine the purpose of the severance and bonus pay, and whether, in light of our holdings on the contested factors, a different division of property is warranted.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Veronica and Daniel ("Dan") Hudson married in July 2011.[1] During the marriage the couple lived in the marital home in the Fairbanks area. Veronica worked as an administrative assistant, earning about $24,000 annually with benefits and retirement. Dan worked for BP on the North Slope, earning around $178,000 annually with benefits and retirement.

In fall 2019 BP announced it was leaving Alaska and selling its assets to Hilcorp. The company gave employees three options: stay employed with BP but leave Alaska, take a position with Hilcorp (which purchased BP's assets in Alaska), or take a severance package and give up the option of further work with Hilcorp or BP. Dan elected to take the severance package, and informed BP of his decision in January 2020. In order to receive the severance pay, Dan was contractually obligated to continue

---

[1]    Because the parties have the same last name, we refer to them by first name for clarity.

working through June 2020 to ensure a smooth transition from BP to Hilcorp management.

In February 2020, Veronica retained a divorce attorney. Veronica did not tell Dan that she was planning to divorce him, and instead continued to send him "romantic and otherwise normal marital text messages." Veronica testified that she did not want to separate until after the school year finished in May. Additionally, Veronica testified that she did not tell Dan about her plans because she feared his reaction based on prior alleged threats and incidents of domestic violence. Dan denies all allegations of domestic violence. Dan also claims that their marriage had "no issues," they had "a great relationship," and he was "totally shocked" when Veronica left.

On June 11 Veronica left Alaska for Nevada. Dan was working for BP on the North Slope on a two-week rotation at the time. Shortly after she left, Dan's son visited their home and noticed that all of Veronica's belongings were gone. Dan called Veronica and she confirmed that she had left him and Alaska, not merely gone on a short trip as she had previously told him. She filed for divorce shortly thereafter.

According to Dan's later testimony, he attempted at that point to get a job with Hilcorp instead of taking the severance, but he was told it was too late. Dan testified that had he known Veronica's plans sooner he would have applied for and likely gotten a job with Hilcorp. On June 18 Dan finished his last shift and returned home from the North Slope. Dan received the severance and a completion bonus later that summer. The severance pay was $145,000, and the completion bonus was $22,671.66.

B. Proceedings

Veronica filed her complaint for divorce on June 15, 2020, a few days after leaving Alaska. A trial date was set for the week of February 22, 2021.

Over three days of trial, both Veronica and Dan testified, along with an appraiser, Dan's financial adviser, and four additional witnesses called by Dan. The major contested issues relevant to appeal are the following division and valuation of

Dan's BP severance and bonus pay; whether domestic violence occurred during the relationship; and the overall economic impact of the divorce on each party. Veronica also requested attorney's fees: either enough fees to cover trial costs or, in the alternative, an order that the $7,500 of marital funds she spent on attorney's fees not be credited to her portion of the marital estate.

### 1. The testimony regarding severance and bonus pay

Both Dan and Veronica testified about Dan's decision to take severance. Dan testified that he took severance because he and Veronica had a plan for him to work part-time and travel to figure out where they wanted to retire outside of Alaska. Veronica testified that she was "not really" part of the decision-making process on whether Dan would take severance; she described the conversations not as "discussions" but just Dan "saying what he wanted to do." She testified that she did not encourage him to retire from BP, that he had plans to continue working after he took severance, and that she did not talk with him about travel or retirement plans.

Dan's financial advisor testified about the value of the couple's retirement accounts and Veronica's involvement in the couple's planning. He testified that while Dan was "the primary contact for a lot of the stuff," Veronica participated in almost every call and even had direct conversations with the advisor about structuring her own retirement accounts. According to the advisor, Veronica's claim that she did not talk to Dan about the retirement plan was "not true."

Dan and Veronica also testified about the purpose of the severance pay and the bonus pay. Neither Dan nor Veronica testified about how the severance pay was calculated, and only Dan testified about his understanding of the purpose of the severance package.[2] Veronica testified that the bonus pay was something that Dan received every year based on performance. Dan testified that the bonus pay was a

---

[2] This testimony was admitted over a hearsay objection and only for Dan's understanding of the purpose, not as evidence of the purpose itself.

"completion bonus" for ensuring BP was able to safely and smoothly hand over operations to Hilcorp.

### 2. The domestic violence allegations

Veronica testified about alleged incidents of domestic violence to rebut Dan's allegation that she "fraudulently duped him into staying in a marriage before she left." She testified that she was afraid of Dan after numerous threats of physical violence. She also testified about one incident of physical violence. On cross-examination Veronica testified that while Dan never punched her, he pushed her and grabbed her by the throat.

Dan denied the allegations outright and said he was "surprised" when he heard Veronica was claiming domestic violence. Dan testified that they had a great relationship and he was not aware of any issues in the marriage.

Dan called four witnesses to testify on this point. One friend, who had known Dan and Veronica since at least 2009, testified that throughout their friendship she never heard of any domestic violence between the couple. This changed when Veronica texted the friend a few months before the trial to say that the "abuse was getting too bad," which is why she left. A second friend of the couple testified that Veronica also called her a few months before trial to "reconnect" and talk about the divorce and abuse.

Dan and Veronica's neighbor testified that Veronica texted her "probably when all this first started." In the text Veronica said she left because the relationship was getting "increasingly physically violent." The neighbor shared the message with Dan because she was "shocked," as she never saw any signs of domestic violence between the couple. Another neighbor, a police officer, also testified that he never saw any signs of domestic violence between the couple.

### 3. The financial status of the parties after separation

Both parties provided testimony about their current financial status. After failing to find a job with Hilcorp, Dan testified that he found employment at Eielson

Air Force Base at the wastewater treatment plant, making approximately $68,000 per year. Dan testified that while this had been less money than he was making, it was the best job he could get. He also receives about $41,000 per year from military disability and retirement. In addition to normal expenses, Dan has a mortgage and home improvement loan on the marital house, which the parties agreed he would keep during the property division.

At the time of trial, Veronica rented a home in Nevada. She testified that she had a full-time, temporary job without benefits, with a contract through March 17, 2021. Her monthly take-home pay was $2,600. After leaving Alaska Veronica applied to numerous jobs in the hopes of finding a permanent position. In addition to her earned income, Veronica received approximately $16,000 per year from a prior ex-husband's military benefits.

Veronica testified that her expenses included typical expenditures such as rent and food, and also payments on a personal debt consolidation loan. Her itemized expenses add up to over $4,000 per month, but Veronica stated on cross-examination that she estimated her expenses were "at least $3,000 a month." Adding to these expenses, Veronica was going to have to purchase her own health insurance after the divorce was finalized. Veronica testified that health insurance would cost about $400 per month if she purchased the COBRA plan from Humana military to replace the coverage she used to have under Dan's military health insurance.[3]

### 4. The superior court's findings and property division order

The superior court issued its final property division on August 31, 2021. The court established June 11, 2020, the day Veronica left the marital home, as the separation date.

---

[3] Evidence admitted at trial actually showed it would cost $533.

In the final order, the court classified Dan's severance pay and bonus pay as his separate property. This decision was based on the fact that the severance pay and bonus pay were conditional benefits before Dan's last day of work, June 18, which was after the parties' date of separation. Additionally, the court discussed the general purpose of severance pay to compensate employees for future lost wages, not past work.

The court made specific findings about each of the statutory factors under AS 25.24.160(a)(4) in order to fairly allocate the economic effect of the divorce.[4] The court found that most of the factors were either neutral or did not apply to the parties' situation.

The court found that both parties' incomes were adequate to cover their expenses, and that both were "financially stable." The court found that Dan could adequately cover his expenses, including the mortgage, with his income. The court also found that Veronica could cover her expenses, including health insurance. Despite a lack of evidence on the point, the court speculated that Veronica could find health insurance on the marketplace that was less expensive than the COBRA Tricare plan she had testified about. The court therefore found that the factor related to the parties' respective financial conditions was neutral.

The court found that the factor related to respective conduct of the parties favored Dan. In particular the court did not find Veronica's domestic violence allegations credible. Therefore, the court found that Veronica acted in bad faith when she concealed her plans to divorce from Dan. The superior court found that Veronica's

---

[4]    The superior court must consider the *Merrill v. Merrill* factors, now codified in AS 25.24.160(a)(4), when deciding an equitable division of marital property. *Hooper v. Hooper*, 188 P.3d 681 (Alaska 2008) (citing *Merrill v. Merrill*, 368 P.2d 546, 547-48 n.4 (Alaska 1962)). Two factors are relevant on appeal: "the financial condition of the parties, including the availability and cost of health insurance," and "the conduct of the parties, including whether there has been unreasonable depletion of marital assets." AS 25.24.160(a)(4)(D)-(E).

actions cost Dan a more lucrative position and that she therefore did not act "appropriately" and the court would "not [reward] her for her bad faith actions."

After making findings about the relevant factors, the court decided that a 50-50 division of the marital estate was equitable. This determination was based on the fact that most of the factors were neutral and each party had one factor weighing in their favor, which "balance[d] out."

The net value of the marital estate was $1,318,396.59. Since the parties agreed that Dan would retain the marital home, valued at $325,000, his share of both marital assets and marital debt was larger. To equalize the distribution to each party, the court ordered Dan to make a $48,614.33 equalization payment to Veronica.

Considering the earning capacity, liquifiable assets, and attorney's fee liability of the parties, the court found that a lump-sum payment would have presented a hardship for Dan. Instead, the court ordered Dan to repay that value through monthly equalization payments. Under the order Dan would have to pay Veronica $810.24 per month for 60 months. Relying upon the size of the marital estate and earning capacity of the parties, the court denied Veronica's request for attorney's fees.

Veronica now appeals the court's property division and various findings under the *Merrill* factors.

## III.  STANDARD OF REVIEW

The first step of an equitable property division, characterizing property as either marital or separate, may involve both legal and factual questions.[5] "[F]indings as to the parties' intent, actions, and contributions to the marital estate are factual questions."[6] "Findings of fact are reviewed for clear error . . . ."[7] "To reverse for clear

---

        **5**        *Grove v. Grove*, 400 P.3d 109, 112 (Alaska 2017) (quoting *Beals v. Beals*, 303 P.3d 453, 458-59 (Alaska 2013)).

        **6**        *Id.* (quoting *Beals*, 303 P.3d at 459).

        **7**        *Id.* (quoting *Hanson v. Hanson*, 125 P.3d 299, 304 (Alaska 2005)).

error, we must be left with a definite and firm conviction on the entire record that a mistake has been made."[8]  Within the superior court's entire analysis, we review the application of legal standards based on our independent judgment.[9]

We review the court's equitable allocation of property for an abuse of discretion, reversing only if it is clearly unjust.[10]  We find an abuse of discretion if the court considered improper factors, failed to consider statutorily mandated factors, or gave too much weight to some factors.[11]

"Trial courts have 'broad discretion' over attorney's fees awards in divorce actions, and we will reverse an award of attorney's fees only if it is 'arbitrary, capricious, manifestly unreasonable, or stems from an improper motive.' "[12]

## IV.   DISCUSSION

Equitable property distribution after divorce involves a three-step process: first, the superior court must characterize property as marital or separate; second, the court must value the property; and third, the court must determine the equitable allocation of the property.[13]  Veronica challenges the first and third steps, specifically (1) the classification of the BP severance pay and completion bonus as separate property; (2) the finding that the conduct of the parties favored Dan; (3) the finding that

---

[8]      *Id.* (quoting *Hansen v. Hansen*, 119 P.3d 1005, 1009 (Alaska 2005)).

[9]      *Rohde v. Rohde*, 507 P.3d 986, 992 (Alaska 2022) (quoting *Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983)).

[10]      *Grove*, 400 P.3d at 112 (citing *Hansen*, 119 P.3d at 1009).

[11]      *Rohde*, 507 P.3d at 991 (quoting *Thompson v. Thompson*, 454 P.3d 981, 995 (Alaska 2019)).

[12]      *Thompson*, 454 P.3d at 989 (quoting *Ruppe v. Ruppe*, 358 P.3d 1284, 1289 (Alaska 2015)).

[13]      *See Grove*, 400 P.3d at 112; *Odom v. Odom*, 141 P.3d 324, 339 (Alaska 2006) (citing *Wanberg*, 664 P.2d at 570).

the financial condition of the parties was neutral; and (4) the court's equalization payment plan. She also challenges the court's denial of her request for attorney's fees.

## A. It Was Error Not To Examine The Purpose Of The Severance And Bonus Pay.

The general rule for determining whether property is marital or separate is whether the property was "created by the enterprise of marriage."[14] "Assets acquired during marriage 'as compensation for marital services' — most commonly salaries earned by either spouse during marriage — are considered marital assets."[15] These assets can include future benefits like retirement plans, so long as those benefits are compensation for work performed during the marriage.[16]

The classification of severance and bonus pay related to employment during the marriage, but received after separation, is an issue of first impression in Alaska. Other states that have decided this issue look to the intended purpose of the severance benefit. Generally, "[t]o the extent the benefits are additional compensation

---

[14] *Schanck v. Schanck*, 717 P.2d 1, 2 (Alaska 1986).

[15] *Schmitz v. Schmitz*, 88 P.3d 1116, 1124 (Alaska 2004) (quoting *Brett R. Turner, Equitable Distribution of Property* § 5.23, at 263 (2d ed. 1994)).

[16] *See Hansen v. Hansen*, 119 P.3d 1005, 1015 (Alaska 2005) (dividing benefits into marital and nonmarital portions based on portion of benefits earned during marriage versus after); *Mann v. Mann*, 778 P.2d 590, 592 (Alaska 1989) (listing variety of retirement benefits that are divisible marital property if earned during marriage). Future benefits that we have determined to be marital property include the following: non-vested pensions, *Laing v. Laing*, 741 P.2d 649, 655-58 (Alaska 1987); federal military retirement benefits, *Doyle v. Doyle*, 815 P.2d 366, 370 (Alaska 1991); *Chase v. Chase*, 662 P.2d 944, 946 (Alaska 1983); federal civil service retirement benefits, *Monsma v. Monsma*, 618 P.2d 559, 561 (Alaska 1980); post-retirement military healthcare benefits, *Horning v. Horning*, 389 P.3d 61, 65 (Alaska 2017); and contributions to a thrift fund made during the marriage, *Schanck*, 719 P.2d at 4. Additionally, worker's compensation and tort recovery are classified as marital property to the extent they compensate for lost wages during the marriage. *Miller v. Miller*, 739 P.2d 163, 165 (Alaska 1987) (workers compensation); *Bandow v. Bandow*, 794 P.2d 1346, 1348-49 (Alaska 1990) (tort recovery).

for prior marital services or a replacement for lost marital pension rights, the benefits are marital property. To the extent that the benefits are compensation for lost post marital wages, they are separate property."[17] Involuntary severance benefits are usually found to compensate for lost future wages when the amount of compensation is based on past salary and given for a number of weeks post-severance.[18] But these benefits are found to compensate for past work when *entitlement* to the severance is based on past service, as opposed to merely using salary as a basis to compute the amount of lost future wages.[19] When determining the purpose of severance pay, courts in other states have relied on the language of the agreement[20] or testimony from the employer.[21]

We conclude that this purpose-based analysis aligns with Alaska law, because it classifies severance benefits based on whether they are "compensation for marital services"[22] or are intended to replace future, post-divorce earnings.

Here, the superior court combined its analysis of both the severance and bonus pay, and it determined that both were separate property. The court's analysis was based in part on when Dan received the severance and bonus pay. Since Dan could

---

[17] 2 BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 6:27 (4th ed. 2018, updated 2023) (citations omitted).

[18] *Id*; *see also In re Marriage of Bishop*, 729 P.2d 647, 648-49 (Wash. App. 1986); *In re Marriage of Holmes*, 841 P.2d 388, 388-91 (Colo. App. 1992); *Franklin v. Franklin*, 859 P.2d 479, 486-87 (N.M. App. 1993); *Zahn v. Zahn*, 420 S.W.3d 706, 709-10 (Mo. App. 2014).

[19] TURNER, *supra* note 17, § 6:27. While it is often true that salary reflects past service, this connection is "not the sort of dependency which makes severance benefits marital property." *Id.*

[20] *See, e.g.*, *Luczkovich v. Luczkovich*, 496 S.E.2d 157, 161 (Va. App. 1998); *In re Bishop*, 729 P.2d at 648.

[21] *See, e.g.*, *In re Holmes*, 841 P.2d at 389-91 (relying on testimony from corporation on purpose of severance).

[22] *Schmitz v. Schmitz*, 88 P.3d 1116, 1124 (Alaska 2004).

not have received the benefit until his last day of work, which was after the date of separation, the superior court found that the severance and bonus pay were separate property. It further concluded that private severance pay is generally intended to ease the economic transition after a worker leaves employment, or to alleviate economic fallout from an unexpected dismissal. On reconsideration the court emphasized and reiterated its finding that severance generally is for lost future wages. But the court did not examine the purpose of this specific severance package.

The focus on the date the benefit vested was erroneous, because the determinative factor is the purpose of the benefit.[23] While the court is correct that in some cases private severance pay is a substitute for future economic loss, or lost future earnings,[24] this is not always the case. Severance packages may also award employees more money based on the length of prior service, and therefore compensate at least partially for past work.[25] It was therefore error for the court not to examine the purpose of the severance pay.

There is little evidence in the record regarding the purpose of the severance package or bonus pay in this case. Neither the severance agreement itself nor any informational materials from BP were admitted at trial.[26] The only information related to the purpose of the severance and bonus pay comes from Dan's and Veronica's testimony. But neither Dan nor Veronica testified about how the severance pay was

---

[23] *See Laing v. Laing*, 741 P.2d 649, 655-56 (Alaska 1987) (holding that nonvested pension was marital property because purpose of benefits was to provide deferred compensation for services already rendered, rather than looking to contingent nature of benefit).

[24] *E.g.*, *Zahn*, 420 S.W.3d at 709-10; *In re Bishop*, 729 P.2d at 649.

[25] *Prescott v. Prescott*, 736 So. 2d 409, 412 (Miss. App. 1999); *Malin v. Loynachan*, 736 N.W.2d 390, 397-98 (Neb. App. 2007).

[26] Dan lists "BP Severance Information Packet" in his Exhibit List, however, it was never offered or admitted at trial.

calculated, and Dan's testimony about the purpose of the severance pay was limited by a hearsay objection.[27]  Both parties testified that the bonus pay was mostly for work Dan had previously performed, but they disagreed on specifics.

Because the superior court erred in failing to examine the purpose of the specific severance and bonus pay at issue, we vacate the court's decision that the severance and bonus pay amounted to separate property, and remand so that the court can consider the purpose of those payments.  We note that this may require admission of additional testimony and other evidence.

## B.    The Court Erred In Analyzing Two Property Division Factors.

The third and final step in a superior court's equitable division of marital assets is dividing the marital estate.[28]  An equal division of property is presumptively a just distribution.[29]  The court must consider and make findings about the factors listed in AS 25.24.160(a)(4), also known as the *Merrill* factors, in reaching its final property distribution.[30]

Veronica argues on appeal that the court erred in finding that the factor related to the conduct of the parties favored Dan,[31] and that the factor concerning the relative financial condition of the parties was neutral.[32]  We conclude that the

---

[27]    The purpose of the severance was only admitted as evidence of Dan's understanding of the purpose, not as proof of the actual purpose.

[28]    *Grove v. Grove*, 400 P.3d 109, 112 (Alaska 2017) (citing *Hansen v. Hansen*, 119 P.3d 1005, 1009 (Alaska 2005)).

[29]    *Odom v. Odom*, 141 P.3d 324, 339 (Alaska 2006) (quoting *Fortson v. Fortson*, 131 P.3d 451, 456 (Alaska 2006)).

[30]    AS 25.24.160(a)(4); *see also Merrill v. Merrill*, 368 P.2d 546, 547-48, 547 n.4 (Alaska 1962).

[31]    Factor 5 is "the conduct of the parties, including whether there has been unreasonable depletion of marital assets."  AS 25.24.160(a)(4)(E).

[32]    Factor 4 is "the financial condition of the parties, including the availability and cost of health insurance."  AS 25.24.160(a)(4)(D).

determination that the "conduct of the parties" factor favored Dan based on Veronica's "bad faith actions" was erroneous. We also conclude that the court erred in finding that the financial condition of the parties was neutral. We therefore vacate and remand the overall property distribution to the superior court for further consideration consistent with this opinion.

> **1.     It was error to find that the relative conduct of the parties favored Dan.**

Under AS 25.24.160(a)(4) a property division must be made "without regard to which of the parties is in fault."[33]  The court, however, can consider "the conduct of the parties, including whether there has been unreasonable depletion of marital assets."[34]  In *Jones v. Jones* we limited the definition of "conduct of the parties" to economic misconduct, in order to resolve this tension.[35]  Economic misconduct does not include a party's "moral or legal marital failings" that lead to the failure of the marriage.[36]  The concept is broad enough, however, to include social or moral failings that lead to an unreasonable depletion of marital assets, such as domestic violence that reduces the earning capacity of one spouse.[37]

Three elements are important to determine whether there has been economic misconduct:  (1) use of marital property for the spouse's own benefit; (2) at a time when the marriage is breaking down (either before or after separation); and (3)

---

[33]     AS 25.24.160(a)(4).

[34]     AS 25.24.160(a)(4)(E).

[35]     942 P.2d 1133, 1139-40 (Alaska 1997).

[36]     *Id.*

[37]     *Id.* at 1139, & n.6 (noting that other jurisdictions have defined economic misconduct justifying unequal property distribution to include situation in which on spouse's physical abuse of the other resulted in health problems and substantial likelihood of future medical expenses for abused spouse).

an intent to deprive the other spouse of their share of the marital property.[38] Not all factors must be present in every case,[39] but the intent to deprive is usually present. The second element is also important, as questionable financial decisions throughout the marriage do not generally constitute economic misconduct.[40]

We have previously found economic misconduct when a spouse vandalized the marital home after separation;[41] a spouse sold marital property in violation of a court order, and collected rent and did not pay maintenance costs on marital rental property;[42] a spouse failed to make mortgage payments and ultimately placed the marital home in foreclosure;[43] and a spouse transferred property to his brother for no compensation right before the divorce was initiated.[44]

Here, the court based its conclusion that this factor favored Dan on two findings. First, the court found that Veronica did not present sufficient evidence of domestic violence to support her theory that Dan committed misconduct warranting an unequal distribution of the marital estate in her favor.[45] Second, since the court did not deem the domestic violence allegations to be credible, the court found that Veronica "purposefully deceived" Dan about her plans to leave with no excuse, leading to his decision to take the severance package instead of continuing to work in a higher-paying

---

[38]     *Id.* at 1140.

[39]     *Jordan v. Jordan*, 480 P.3d 626, 631 (Alaska 2021) (quoting *Jones*, 942 P.2d at 1140 n.7).

[40]     *See Elliott v. James*, 977 P.2d 727, 733 (Alaska 1999) (affirming lack of economic misconduct where intent factor not present and evidence only showed party was a poor money manager during marriage).

[41]     *Stanhope v. Stanhope*, 306 P.3d 1282, 1288-89 (Alaska 2013).

[42]     *Hockema v. Hockema*, 403 P.3d 1080, 1094 (Alaska 2017).

[43]     *Oberhansly v. Oberhansly*, 798 P.2d 883, 884-85 (Alaska 1990).

[44]     *Forshee v. Forshee*, 145 P.3d 492, 501 (Alaska 2006).

[45]     Veronica does not challenge this aspect of the superior court's ruling.

- 15 -                                                                         7665

position. Dan testified that he would not have taken severance from BP and he would have tried to get a position with Hilcorp if he had known Veronica was leaving. The court held that Veronica's "bad faith actions" amounted to economic misconduct because they resulted in the reduction of Dan's earning capacity. In all, the court found this factor favored Dan, because it did not want to reward Veronica after finding that she "did not act appropriately," and because her actions led to "a negative economic impact on [Dan]."

It was error to conclude that Veronica's conduct before separating from Dan amounted to economic misconduct, because the factors typically important to evaluating claims of economic misconduct were not considered.[46] In comparison to other cases where we have found economic misconduct, Veronica did not destroy property, fail to pay a mortgage, disobey a court order relating to marital property, or otherwise devalue the marital estate.[47] Indeed, we have previously determined that one spouse concealing plans to separate while making financial decisions is not economic misconduct without a showing of economic harm to the marital estate.[48] In *Heustess v. Kelly-Heustess* we concluded that a husband did not commit economic misconduct when he participated in refinancing the marital home right before separation, even though he knew at the time that he wanted to separate from his spouse.[49] There, we reasoned that the refinancing did not deplete the marital estate; rather, the refinancing helped the parties to pay off marital debt.[50]

---

[46] *Jones v. Jones*, 942 P.2d 1133, 1139-40 (Alaska 1997).

[47] *See* cases cited *supra* notes 41-44.

[48] *Heustess v. Kelley-Heustess*, 158 P.3d 827, 831-33 (Alaska 2007).

[49] *Id.*

[50] *Id.* This was true even though most of the debt that was paid off was incurred by the husband, but was nevertheless still marital debt. *Id.* at 830-32.

Here, there was no explicit discussion of the three factors that may establish economic misconduct. And our review of the record does not uncover evidence that establishes such misconduct. Examining the three factors, the record arguably supports only one: Veronica's deception may have occurred "when the marriage [was] breaking down."[51] The timing is not wholly clear from the record, but considering Veronica retained an attorney in February 2020, it is likely that the marriage was breaking down when Dan decided to take severance in January 2020.

Evaluating the first factor, Veronica did not damage the marital estate.[52] All of Dan's earnings after she left are separate property, regardless of whether she told him she was leaving or what job he had. Concealing her plans from Dan did not constitute use of personal property or result in any financial benefit to her. As to the final factor, regardless of Veronica's intent in withholding her plans to separate from Dan, the record contains no evidence supporting any claim that her actions negatively impacted the value of the marital estate or decreased Dan's share of the marital estate.

In all, the analysis of this factor was flawed because the appropriate legal factors were not considered. We therefore reverse the court's finding that Veronica committed economic misconduct and that the relative conduct of the parties favored Dan. Given the record in this matter, this factor is neutral, favoring neither party.

### 2. The finding that the financial circumstances factor was neutral is clearly erroneous.

Another factor courts must consider in determining an equitable division of property is "the financial condition of the parties, including the availability and cost of health insurance."[53] Generally, this factor includes an evaluation of the parties'

---

[51]    *Jones*, 942 P.2d at 40.

[52]    Veronica did use marital property for her own benefit when she left. While she took half of their cash, and used some marital funds to pay for an attorney, those things were ultimately credited against her portion of the estate.

[53]    AS 25.24.160(a)(4)(D).

reasonable expenses relative to their earning capacity and other debts.[54]  In evaluating this factor, this court allows the consideration of separate property, such as Social Security payments and separate retirement funds.[55]  The statute explicitly requires that the superior court consider the cost of health insurance within this balancing.[56]

The superior court found that "[b]oth parties are financially stable" and able to cover their expenses from their monthly salaries.[57]  But the court provided little discussion of the parties' earnings and expenses to support its determination. The court did consider Veronica's health insurance costs in deciding this factor was neutral, but noted that "Veronica receives health insurance outside of her employment" and that it was "not convinced that Veronica does not have other, more economical options through state-certified health insurance plans."

The finding that the parties enjoyed fairly equal financial conditions is not supported by the record.  The disparity in access to health care is wide:  Dan will receive military Tricare health benefits at little to no cost for the rest of his life, while Veronica will have to purchase health insurance.  At the time of trial, Dan's income was twice as large as Veronica's.  Although Dan was allocated the mortgage on the marital home, a significant expense, he was also allocated the home itself, a significant asset. Additionally, there is evidence in the record that Veronica would not be able to cover

---

[54]     *Odom v. Odom*, 141 P.3d 324, 340 (Alaska 2006) (noting party's lack of work experience and retirement funds in comparison to substantial need for supporting children); *Jordan v. Jordan*, 480 P.3d 626, 632-34 (Alaska 2021) (evaluating one party's financial need based on debts relative to earning capacity, which was much lower than ex-spouse's).

[55]     *Dunmore v. Dunmore*, 420 P.3d 1187, 1191-93 (Alaska 2018) (Social Security payments); *Odom*, 141 P.3d at 340-41 (retirement funds).

[56]     AS 25.24.160(a)(4)(D).

[57]     On reconsideration the superior court maintained that "although the parties earning capacities are different, the parties felt a similar economic effect from their expenses," including insurance and other debts.

her monthly expenses in her current employment situation, even without factoring in healthcare insurance costs.[58]

While evidence of the financial status of the parties in the record is not particularly detailed, it clearly shows that Dan's financial condition, especially in light of his future health insurance costs, was much better than Veronica's. The finding that the parties enjoyed equal financial status was clearly erroneous. We thus reverse the superior court's determination that this factor was neutral, and hold that this factor weighs in favor of Veronica. We remand the overall property division to the superior court to determine an equitable division in light of our holdings.[59]

### C. It Was An Abuse Of Discretion To Order Equalization Payments Over A Five-Year Term.

In general superior courts have discretion to determine the best method for equalizing the marital estate.[60] The preferred method is transfer of property.[61] A lump sum equalization payment is also appropriate where there is "no hardship" to the paying party.[62] Courts have discretion to award equalization payments over a period of time, if the equalization amount is too large for a party to make in a single payment.[63] This discretion must be informed by the underlying preference to avoid continued

---

[58] At trial, Veronica reported more than $4,000 in monthly expenses, but her total monthly income at the time of trial was $3,878.

[59] Veronica argues, based on her lower earning capacity and greater health care costs, that the court should order a 60-40 split of the marital estate in her favor. In light of the extensive factual findings required to determine an equitable property division, we do not reach the ultimate issue of what overall division of property is equitable; rather, we remand so that the superior court can reach that determination in light of our decision.

[60] *Thompson v. Thompson*, 454 P.3d 981, 997 (Alaska 2019).

[61] *Cox v. Cox*, 931 P.2d 1041, 1045 (Alaska 1997).

[62] *See Green v. Green*, 29 P.3d 854, 861 (Alaska 2001) (quoting *Cox*, 931 P.2d at 1045); *Fortson v. Fortson*, 131 P.3d 451, 459 (Alaska 2006).

[63] *Thompson*, 454 P.3d at 997.

financial entanglement of the parties by resolving financial concerns in the property division.[64]

When determining whether to order a lump sum or installment payments, the court must consider all relevant financial circumstances. This includes the negative impact of a lump sum payment on the obligor,[65] and the hardship the recipient may suffer from delay due to equalization payments made over time.[66] If the court orders equalization payments over time, it must give sufficient reasons for that decision.[67] For equalization payments over multiple years, the trial court can award interest to account for the time value of money.[68]

Here, the court looked to the parties' earning capacity, liquefiable assets, and attorney's fee liability in determining that a lump-sum equalization payment would pose a hardship for Dan. Rather than order a lump-sum equalization payment, the court ordered payments stretching over five years, and did not award interest.

This decision was an abuse of discretion. Dan has significant liquefiable assets in the marital home, along with the severance and bonus pay from BP. The court valued the marital home at $325,000, and the severance and bonus pay totaled

---

[64]    *See Fernau v. Rowdon*, 42 P.3d 1047, 1058 (Alaska 2002) (stating the preference to resolve financial concerns during divorce through property division instead of spousal support to avoid financial ties over a long period of time); *Hopper v. Hopper*, 171 P.3d 124, 135 (Alaska 2007) (noting the same).

[65]    *Fortson*, 131 P.3d at 459.

[66]    *Thompson*, 454 P.3d at 997.

[67]    *McDaniel v. McDaniel*, 829 P.2d 303, 309 (Alaska 1992).

[68]    "[T]he power to award or withhold interest on a judgment should prove a useful tool in effecting a just resolution of a divorcing couple's financial affairs." *Dixon v. Dixon*, 747 P.2d 1169, 1172 (Alaska 1987); s*ee also Thompson*, 454 P.3d at 997 (discussing four-year repayment plan with 5% interest on $85,000 equalization payment); *Stanhope v. Stanhope*, 306 P.3d 1282, 1286, 1293 (Alaska 2013) (allowing one year to make equalization payment with no interest based on evidence of earning capacity and limited assets).

$167,671.66. These are significant amounts, especially in comparison to the size of the equalization payment ($48,614.33). These assets indicate that a lump sum payment would not pose a hardship for Dan — certainly not so much as to justify keeping the parties financially entangled for the next five years.[69]

Additionally, the lack of an award of interest ignored the time value of money. Considering the size of the equalization payment relative to the marital estate, the lack of provision for interest over five years represents a loss in value that could impact the percentage allocation of the property division in favor of Dan. While the court has discretion in determining whether or not to award interest, it must explain its decision.[70] This is especially true in a case such as this, where the timeline of the repayment without interest could impact the overall property division.

Given that the status of significant assets and the ultimate overall property division may change on remand, we refrain from mandating a lump sum equalization payment. However, we vacate the court's equalization payment schedule, and remand for further consideration consistent with the above discussion.

### D. The Superior Court Did Not Abuse Its Discretion When It Denied Veronica's Request For Attorney's Fees.

"The superior court has broad discretion in awarding attorney's fees in divorce cases."[71] The goal is to ensure both parties are litigating on an equal plane, not to reward a prevailing party.[72] When deciding whether an award of attorney's fees is

---

[69] *See Stanhope*, 306 P.3d at 1293 (relying on very low earning capacity and limited assets to justify giving party one year to make equalization payment).

[70] *See Cox v. Cox*, 931 P.2d 1041, 1045 (Alaska 1997) (overturning lump sum equalization payment because it was unclear if superior court considered other methods or hardship).

[71] *Stevens v. Stevens*, 265 P.3d 279, 290 (Alaska 2011) (citing *Carr v. Carr*, 152 P.3d 450, 457 (Alaska 2007)).

[72] *Id.* (quoting *Fernau v. Rowdon*, 42 P.3d 1047, 1059–60 (Alaska 2002)); *Day v. Williams*, 285 P.3d 256, 268 (Alaska 2012).

appropriate, the court must consider the relative financial status and earning capacity of the parties at the time of trial.[73] Absent a significant disparity in finances, a refusal to award fees is likely not an abuse of discretion, especially if the moving party received significant assets from the property distribution.[74]

Here, the superior court found that an attorney's fees award to either party was unwarranted because each party could afford to pay fees based on the marital estate's size. This determination was not an abuse of discretion.

Veronica argues that the court should have looked *solely* at the relative earning capacity of the parties when deciding the question of attorney's fees, rather than at the size of the party's share of the estate. Veronica relies on *Day v. Williams*, where we upheld an award of attorney's fees based on significant income and health disparities between the parties, regardless of the size of the estate.[75] But it would be a mistake to interpret *Day* — where we held the trial court was within its broad discretion in awarding attorney's fees to ensure an even playing field between divorcing parties — as removing a trial court's discretion in balancing parties' earning capacities with their access to sizable marital assets in deciding whether to award either party attorney's fees.[76] Indeed, we have repeatedly affirmed trial courts' consideration of both income and the size of the marital estate in determining whether an award of attorney's fees was appropriate.[77] Given the total record, it was not an abuse of discretion for the court to deny Veronica's request for an award of partial attorney's fees.

## V.    CONCLUSION

---

[73]    *Stevens*, 265 P.3d at 290.

[74]    *See id.* at 291.

[75]    285 P.3d at 259, 267-68.

[76]    *Id.*

[77]    *Tybus v. Holland*, 989 P.2d 1281, 1289 (Alaska 1999); *Thiele v. Thiele*, 473 P.3d 327, 336 (Alaska 2020); *Stevens v. Stevens*, 265 P.3d at 290-91.

We VACATE the superior court's determination that the severance and bonus pay are separate property and REMAND for further consideration in light of this decision. We REVERSE the superior court's findings related to the relative conduct and financial circumstances of the parties, and REMAND for the court to determine an equitable property distribution, and to further address the terms of any equalization payment, consistent with this decision. We AFFIRM the superior court's denial of attorney's fees.