PAULA J. MALIN, APPELLANT, V.
BRIAN M. LOYNACHAN, APPELLEE.
736 N.W.2d 390

Filed July 10, 2007.    No. A-05-1012.

Virginia A. Albers and Adam E. Astley, of Lieben, Whitted, Houghton, Slowiaczek & Cavanagh, P.C., L.L.O., for appellant.

Brent M. Kuhn and Michaela Skogerboe, of Harris Kuhn Law Firm, L.L.P., for appellee.

Irwin, Carlson, and Moore, Judges.

Carlson, Judge.

## INTRODUCTION

Paula J. Malin appeals from an order of the district court for Sarpy County, Nebraska, which dissolved her marriage to Brian M. Loynachan. On appeal, Paula contends that the trial court erred in failing to equally divide the marital estate. For the reasons set forth below, we affirm as modified.

## BACKGROUND

In January 2005, Paula filed a complaint seeking the dissolution of the parties' marriage. Trial was held on June 27, 2005. The evidence produced at trial shows that the parties began dating in August 1988 and were married on February 6, 1999, after living together for 3 years. Paula attended medical school from 1996 through 1999 and subsequently completed a 4-year residency. While a medical resident, Paula earned between $39,000 and $44,000 per year. At the time of trial, Paula was employed as the director of psychiatry for Creighton University Medical Center and was making around $135,000 per year.

Brian has a degree in industrial engineering and a master's degree in business administration from Drake University. Brian was employed with Auburn Consolidated Industries, Inc. (ACI), from 1997 through 2004. In October 2004, Brian's employment

with ACI was terminated and Brian received a severance package. This severance package included $11,022.30 in vacation pay, $98,581.08 in severance pay, a bonus of approximately $1,390.60, a $5,000 payment described as "Outsource assistance," and a company vehicle valued at $15,710. After deducting taxes, Brian received $71,000 from his severance package, excluding the vehicle, and he deposited this amount into the parties' joint Charles Schwab investment account. Brian testified that although he had made efforts to find other employment, he remained unemployed at the time of trial.

Shortly after the parties' marriage, they purchased a house and made a $20,000 downpayment. The $20,000 came from Brian's parents, who wrote Brian and Paula each a check for $10,000. In October 2004, the parties sold their home and purchased a larger one. Brian testified that they used the money they received from the sale of the first house and the $20,000 they received from his parents as a downpayment on their second home. The closing statement relating to the purchase of the parties' second home shows that the parties put down $71,582.33 as a downpayment. After Paula filed for divorce, the parties agreed to sell the home and a buyer offered to purchase the home for $359,900. Paula then changed her mind and decided to keep the house. As of March 10, 2005, the mortgage balance on the house was $276,315.88.

Both Brian and Paula have retirement accounts. Brian's 401K at ACI, in December 1998, was worth $122,689.58, but had a loan against it in the amount of $33,829.20. This loan was paid off during the parties' marriage. Brian testified that while he and Paula lived together, Paula was not making enough money to pay her half of the expenses, and so he had to borrow against his 401K. Brian's 401K was worth $226,809.89 as of May 2005. The record shows that Paula has a 403B retirement account through Creighton University with a total balance of $62,008.46 as of January 1, 2005. At the time of trial, Brian was driving his BMW automobile, which he valued at $12,845, and Paula was driving a 2002 Volkswagen Beetle valued at $11,260. Additionally, the parties split the household goods, with Brian receiving goods worth $6,000 and Paula receiving goods worth $6,300.

Paula testified that she had reviewed Brian's credit card statements and that there were a number of charges for things such as trips, jewelry, and lingerie purchases that were not incurred for her benefit. Paula asked that the court take into account this fact when dividing the parties' marital estate. Those credit card statements show that Brian owed $12,526.67 for charges he made from July 2002 to January 2005. Brian testified that he incurred some expenses for someone other than his wife during the marriage, but that he spent only $9,000, not $12,000, for himself and a third party. Brian testified that he paid these credit card charges with his own income.

In an order filed August 4, 2005, the trial court dissolved the parties' marriage. The trial court awarded Paula the house, stating that the fair market value was $359,900 with a mortgage balance of $276,315.88 for equity of $83,584.12. The trial court found that the equity balance should be partially offset by a $20,000 credit to Brian given that he received a gift in that amount from his parents which was used to purchase the family home. The trial court awarded Paula 100 percent of her retirement account at Creighton University and awarded Brian 100 percent of his retirement account at ACI. In calculating the value of Brian's retirement account, the court found the marital portion of Brian's retirement account to be $104,120.31, given that Brian's retirement account had a value of $122,689.58 at the time of the marriage and a present value of $226,809.89.

The trial court ordered that Brian's severance package in the net amount of $71,000, which was placed into the parties' Charles Schwab account, "should be offset to [Brian,] being in the nature of wages." The trial court awarded Brian the balance of the Charles Schwab account, $164,214.53, less the sum of $51,015.31 to be paid to Paula for her portion of the marital funds in this account. The court also awarded each party the vehicle and the personal property in his or her possession at the time of trial and found that this property had approximately equal values. The trial court declined to order Brian to reimburse the marital estate for the $9,000 he admitted spending for the benefit of himself and a third party. The trial court divided the marital estate equally, with each party receiving assets of $197,319.53. Paula appeals.

## ASSIGNMENTS OF ERROR

On appeal, Paula contends that the district court erred in failing to equally divide the marital estate. Specifically, Paula argues that the trial court erred in (1) failing to require Brian to reimburse the marital estate for approximately $9,000 in funds dissipated while the marriage was undergoing irretrievable breakdown; (2) failing to deduct a premarital loan balance of $33,829 from the premarital funds in Brian's 401K account with ACI; (3) setting off the first $20,000 of equity in the marital home to Brian as his separate, nonmarital property; and (4) setting off the first $71,000 of the parties' joint Charles Schwab account to Brian as being "in the nature of wages."

## STANDARD OF REVIEW

■ In actions for the dissolution of marriage, the division of property is a matter entrusted to the discretion of the trial judge, which will be reviewed de novo on the record and will be affirmed in the absence of an abuse of discretion; a "judicial abuse of discretion" exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Nygren v. Nygren,* 14 Neb. App. 1, 12, 704 N.W.2d 257, 266 (2005).

## ANALYSIS

*Dissipation of Funds.*

Paula argues that the trial court erred in failing to require Brian to reimburse the marital estate for approximately $9,000 in funds dissipated while the marriage was undergoing irretrievable breakdown.

■ Marital assets dissipated by a spouse for purposes unrelated to the marriage after the marriage is irretrievably broken should be included in the marital estate in dissolution actions. *Harris v. Harris,* 261 Neb. 75, 621 N.W.2d 491 (2001). "Dissipation of marital assets" is one spouse's use of marital property for a selfish purpose unrelated to the marriage at the time when the marriage is undergoing an irretrievable breakdown. *Id.* at 87, 621 N.W.2d at 501.

In *Brunges v. Brunges*, 260 Neb. 660, 667, 619 N.W.2d 456, 462 (2000), a marital dissolution action, the Nebraska Supreme Court held that the trial court erred in not including in the marital estate certain assets (a retirement fund and proceeds from a sale of real estate) "liquidated" by the husband after the parties had separated and for which he had not properly accounted. Although the husband testified that these assets were "'put towards . . . bills,'" he did not offer any testimony or documentation as to the specific bills that were paid. *Id.* at 665, 619 N.W.2d at 461.

In *Harris v. Harris*, the wife "'asked'" the husband for a divorce in April 1995, but did not file to dissolve the parties' marriage until May 1998. 261 Neb. at 79, 621 N.W.2d at 496. However, the testimony established that the parties were estranged in 1995. Beginning in May 1995, the husband began making large withdrawals from the parties' savings fund. The husband was able to account, through testimonial and documentary evidence, for a portion of the withdrawals as having been used for marital expenses. The balance of the unaccounted-for funds accumulated during the marriage was treated as marital property that the husband had dissipated, and the balance was assigned to the husband in the division.

In *Harris v. Harris*, the parties were estranged at the time of the dissipation of the marital assets, while in *Brunges v. Brunges, supra*, the parties were separated. In the instant case, the parties were not separated or estranged during the time that Brian allegedly dissipated marital assets. We do not conclude that an irretrievable breakdown can be found only when the parties are estranged or have separated. However, in the present case, there is no evidence to support a finding that the parties' marriage was undergoing an irretrievable breakdown during the time period that Brian allegedly dissipated assets. It is true that Brian was spending money on a third party at that time, but that fact, in and of itself, is insufficient to allow us to conclude that an irretrievable breakdown of the parties' marriage was occurring. Therefore, the trial court did not err in failing to require Brian to reimburse the marital estate for approximately $9,000 in funds alleged by Paula to have been dissipated while the marriage was undergoing irretrievable breakdown.

*Premarital Loan Balance—Brian's 401K.*

Paula also argues that the trial court erred in failing to reduce Brian's premarital 401K balance of $122,689 by the loan of $33,829 repaid with marital funds. Brian contends that equity does not require the deduction of a premarital loan balance from the premarital funds in Brian's 401K account when the proceeds from the loan were used to support Paula.

At trial, the evidence showed that the premarital balance of Brian's 401K was $122,689.58 with an outstanding loan of $33,829.20. The trial court did not deduct the loan balance in determining the premarital balance of Brian's 401K. Rather, the trial court considered Brian's premarital 401K to be worth $122,689.58.

Paula suggests that Brian agreed that the premarital account value of his 401K should be valued by subtracting the loan balance from the account balance, because when asked whether this would be the correct way to value the account, Brian stated, "'You could do it that way.'" Brief for appellant at 25. We note though that on redirect examination, when Brian's counsel asked Brian why he had not deducted the loan balance in arriving at the value of his premarital 401K, Brian stated, "That [loan money] was used while [Paula and I] were in California when I was making enough money to pay for my half of the expenses, but Paula . . . was not. And so I had to borrow against my 401(K) to help her pay her 50 percent of the expenses." Paula did not dispute Brian's testimony, and on this record, we cannot say that the trial court abused its discretion in valuing Brian's premarital 401K at $122,689.58.

*Equity in Marital Home.*

█ Specifically, Paula argues that the trial court erred in setting off the first $20,000 of equity in the marital home to Brian as his separate, nonmarital property. The purpose of a property division is to distribute the marital assets equitably between the parties. Neb. Rev. Stat. § 42-365 (Reissue 2004); *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004).

█ Under § 42-365, the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and marital liabilities of the parties. The third

step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Gangwish v. Gangwish, supra.*

Brian argues that the trial court correctly determined that equity requires that he should be credited for the $20,000 received from his parents. The court granted Brian a $20,000 credit, stating, "[T]he fair thing is that he get at least the credit for the [$]20,000 that helped build up the equity in the first house and transferred over to the new house." We disagree.

In *McGuire v. McGuire*, 11 Neb. App. 433, 652 N.W.2d 293 (2002), a husband claimed that a $7,000 check from his father was a gift to him and should be treated as nonmarital property. The record showed that that money was put into a joint checking account and that the parties used the money to purchase the marital home, to which the parties took title as joint tenants with right of survivorship. The husband also argued that he should get appreciation on the $7,000 investment in the house.

As a general rule, all property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to the general rule. *Gangwish v. Gangwish, supra.* With some exceptions, the marital estate does not include property acquired by one of the parties through gift or inheritance. *McGuire v. McGuire, supra.* The burden of proof to show that property is nonmarital remains with the person making the claim. *Gangwish v. Gangwish, supra.*

In *McGuire v. McGuire, supra*, we held that although the husband testified that the check from his father was a gift to him, he failed to meet his burden to show that the check was a gift to him only and not to the marital estate. In *McGuire v. McGuire*, the parties, as well as the husband's father, all agreed that the husband's father gave the parties the $7,000 to help them purchase a home during their marriage. Furthermore, the home was jointly titled in their names. We concluded, "This is not a situation where money should be set off to one party, because [the husband's father's] intent in giving the money was to benefit the marital estate . . . ." *Id.* at 442, 652 N.W.2d at 301. We further stated, "It is the intent of [the father], the donor, and

the method by which the parties used the money that controls [sic]. We therefore conclude that the district court did not abuse its discretion in including this sum of money in the marital estate." *Id.*

In the instant case, the evidence shows that Brian's parents wrote Brian and Paula each a $10,000 check in 1999 for the purpose of helping them finance their first home and that the parties used this $20,000 as a downpayment on their first home. The evidence shows that each check was made out on June 8, 1999, and that the parties purchased their first home in June 1999. The record shows that like the husband's parents in *McGuire v. McGuire*, Brian's father gave the parties several thousand dollars to assist them in purchasing their first home shortly after they married. As in *McGuire v. McGuire*, the person making the claim regarding the gift has failed to meet his burden to show that this money was nonmarital. Given the evidence that Brian's parents intended the parties to use the $20,000 for a downpayment on a marital home and that the money was used for this purpose, the trial court erred in granting Brian a credit in that amount.

### Brian's Severance Package.

Paula also argues that the trial court erred in setting off the first $71,000 of the parties' joint Charles Schwab account to Brian as being "'in the nature of wages.'" Brief for appellant at 17. The record shows that after Brian lost his job at ACI, he received a monetary severance package worth $115,993.98 gross and a company vehicle valued at $15,710. After deducting taxes, Brian received approximately $71,000 from his severance package, excluding the vehicle, and he deposited this amount into the parties' joint Charles Schwab investment account.

The trial court considered the company vehicle to be part of the marital estate, but set off the entire $71,000 Brian received as nonmarital property. We note that Brian had the burden to show that this money was nonmarital. See *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004). After reviewing the evidence, we conclude that Brian did not meet his burden to show that the entire $71,000 should be set off to him as nonmarital property.

Although Nebraska has not addressed the issue of how to divide a spouse's severance package in a dissolution action, several other jurisdictions have done so and have concluded that the question is what portion of the severance package the spouse earned during the marriage and whether the spouse claiming that the severance package is not marital property met his or her burden to establish how much of the severance package is nonmarital. See, *Jewett v. Jewett*, 265 Conn. 669, 830 A.2d 193 (2003); *Grigsby v. Grigsby*, 648 N.W.2d 716 (Minn. App. 2002); *McNamara v. Horner*, 249 Mich. App. 177, 642 N.W.2d 385 (2002).

Applying that rule to the instant case, the evidence shows that Brian's severance package included several amounts: $11,022.30 in vacation pay, $98,581.08 in severance pay, a bonus of approximately $1,390.60, and a $5,000 payment described as "Outsource assistance." The record shows that the $98,581.08 in severance pay consisted of 1 month's salary per year of service. Brian worked at ACI for a total of 7 years 4 months, or 88 months. The record also shows that Brian and Paula were married for 5 years 8 months, or 68 months total, at the time Brian left his job at ACI.

Therefore, for our purposes, Brian earned 77.27 percent of his $98,581.08 severance pay at ACI during the parties' marriage. Given that this $98,581.08 was subject to a tax rate of 38 percent, the marital estate should have included an additional 77.27 percent of $61,120.27 (62 percent of $98,581.08), or $47,227.63. The remainder of the $61,120.27, or $13,892.64, was correctly determined to be nonmarital property and set aside to Brian. Furthermore, Brian produced no evidence to show that the other amounts he received in his severance package—$11,022.30 of vacation pay, $1,390.60 of bonus money, and $5,000 in outsourcing assistance—should be excluded from the marital estate, so we consider an additional $10,796 (62 percent of $17,412.90) to be marital property.

At trial, Brian testified that he placed his entire severance package into the parties' joint Charles Schwab account. The record shows that that account had a balance of $235,214.53 as of the parties' separation. The trial court set aside the entire $71,000 of Brian's net severance package to Brian as his

nonmarital property, and out of the remaining account balance, which was $164,214.53, the court awarded Paula $51,015.31 to balance the estate; Brian received the remainder of $113,199.22. The record shows that instead of $71,000, Brian actually received $71,916.27 after taxes from his severance package (62 percent of ($98,581.08 + $11,022.30 + $1,390.60 + $5,000)).

Given the record before us, we conclude that the trial court abused its discretion in setting off the entire $71,000 balance to Brian. At trial, Brian met his burden to show that a portion of his severance package was earned prior to the marriage, but the remainder should be added back to the balance of the Charles Schwab account. Additionally, as noted above, the trial court erred in granting Brian a $20,000 credit for the downpayment Brian's parents gave the parties for their first home. Therefore, we remove this credit.

Therefore, we subtract Brian's nonmarital portion of his severance pay, $13,892.64, from the total amount of the Charles Schwab account, or $235,214.53, leaving this account with a marital value of $221,321.89. We then divide the funds in that account, keeping in mind that the facts and circumstances of this case dictate an equal division of the marital estate as determined by the trial court. This would leave Brian with $131,752.90 of the marital portion of the Charles Schwab account, while Paula would receive $89,568.99 of the marital funds in that account. The parties would continue to receive the other assets awarded to them by the trial court, with Paula receiving the home with a net value of $83,584.12 and her 403B of $62,720.10 while Brian would receive his 401K valued at $104,120.31. Paula and Brian would also receive the household goods and the vehicle in their respective possession, the values of which are approximately equal. In total, each party would receive half of the marital estate, or $235,873.21, plus the goods in his or her possession and his or her respective vehicle.

## CONCLUSION

After reviewing the record, we conclude that the district court did not err in failing to require Brian to reimburse the marital estate for approximately $9,000 in funds allegedly dissipated while the marriage was undergoing irretrievable breakdown or in failing to deduct a premarital loan balance of $33,829 from

the premarital funds in Brian's 401K account with ACI. The trial court did err in setting off the first $20,000 of equity in the marital home to Brian as his separate, nonmarital property and in setting off the first $71,000 of the parties' joint Charles Schwab account to Brian as being "in the nature of wages." We determine that only $13,892.64 of the Charles Schwab account was nonmarital. Accordingly, we modify the marital estate, awarding Paula $89,568.99 of the Charles Schwab account and Brian $131,752.90. In all other respects, the trial court's order is affirmed.

AFFIRMED AS MODIFIED.