Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/12/2024 09:07 AM CDT

Nataliya Knapp, appellee, v.
Leland Knapp, appellant.

___ N.W.2d ___

Filed March 5, 2024.    No. A-23-040.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees.
2. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.
3. **Divorce: Property Division: Alimony.** In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party.
4. **Divorce: Property Division.** In addition to the specific criteria listed in Neb. Rev. Stat. § 42-365 (Reissue 2016), a court should consider the income and earning capacity of each party and the general equities of the situation.
5. **Alimony.** The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate.
6. **Alimony: Appeal and Error.** In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's

award is untenable such as to deprive a party of a substantial right or just result. The ultimate criterion is one of reasonableness.

7. ____: ____. An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record.

8. **Evidence: Appeal and Error.** When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

9. **Divorce: Property Division.** Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365.

10. **Property Division.** As a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case.

11. **Divorce: Property Division.** Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate.

12. ____: ____. The marital estate does not include property that a spouse acquired before the marriage, or by gift or inheritance.

13. **Property Division.** Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property.

14. ____. Setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists.

15. **Property Division: Proof.** Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. But if the separate property remains segregated or is traceable into its product, commingling does not occur.

16. ____: ____. The burden of proof rests with the party claiming that property is nonmarital.

17. **Divorce: Property Division: Proof: Testimony.** A nonmarital interest in property may be established by credible testimony.

18. **Trial: Witnesses: Evidence.** Triers of fact have the right to test the credibility of witnesses by their self-interest and to weigh it against the evidence, or the lack thereof.

19. **Trial: Evidence.** Evidence not directly contradicted is not necessarily binding on the triers of fact, and may be given no weight where it is inherently improbable, unreasonable, self-contradictory, or inconsistent with facts or circumstances in evidence.

20. **Testimony: Proof.** A party opting to rely upon his or her testimony alone does so at the risk of nonpersuasion.

21. **Trial: Evidence: Appeal and Error.** An appellate court will consider the fact that the trial court saw and heard the witnesses and observed their demeanor while testifying, and will give great weight to the trial court's judgment as to credibility.

22. **Employer and Employee.** In most cases, the ostensible purpose of severance pay is to provide a salary substitute for the worker while he or she searches for a new job.

23. **Divorce: Property Division.** If intended as deferred compensation for marital labor, severance pay is marital property; however, if intended to replace postdivorce earnings, such payments are classified as the worker's separate property.

24. ____ : ____. When classifying severance pay as marital or nonmarital, a court should determine the purpose of the severance pay. When severance benefits constitute additional compensation for past work during the marriage or a replacement for lost marital pension rights, then the benefits are marital property. However, when severance benefits are compensation for lost postmarital wages, then they are separate, nonmarital property.

25. **Property Division: Taxes.** Income tax liability incurred during the marriage is one of the accepted costs of producing marital income, and thus, income tax liability should generally be treated as a marital debt.

Appeal from the District Court for Douglas County: Molly B. Keane, Judge. Affirmed as modified.

Ryan D. Caldwell, of Caldwell Law, L.L.C., for appellant.

Philip B. Katz and John Andrew McWilliams, of Gross, Welch, Marks & Clare, P.C., L.L.O., for appellee.

Moore, Bishop, and Arterburn, Judges.

Bishop, Judge.

## I. INTRODUCTION

The Douglas County District Court dissolved the marriage of Leland Knapp (Jody) and Nataliya Knapp, awarded them

joint legal and physical custody of their children, and divided their property and debts. On appeal, Jody challenges the district court's decision in (1) awarding Nataliya the marital home, alimony, and the family cats; (2) not awarding him credit for his premarital interests in the marital home and a retirement account; (3) including all of his employment severance payments as part of the marital estate; and (4) failing to determine his 2021 tax liability was a marital debt. Finding merit to Jody's claim regarding his severance payments, we affirm as modified.

## II. BACKGROUND

### 1. Initial Pleadings and Pretrial Proceedings

Jody and Nataliya were married in Vermont in April 2003. They had two sons, ages 18 and 15, at the time of trial. In November 2021, Nataliya filed a complaint for dissolution of marriage, and Jody filed a counterclaim. The parties both filed motions requesting that the court enter a temporary order related to various matters. After a hearing, the court entered a temporary order: granting joint legal and physical custody of the children; ordering the parties to rotate possession of their two cats; ordering Jody to pay Nataliya $750 per month in child support, plus $1,000 per month for the mortgage associated with the marital home; and awarding Nataliya exclusive possession of the marital home and requiring her to pay the mortgage on the home.

In March 2022, Nataliya filed a motion requesting that the temporary order be amended to alter the parenting time schedule and eliminate the rotation of the possession of the cats. Also in March, Jody filed a "Motion to Determine 2021 Tax Filing Status," requesting that the district court order the parties "to file married filing jointly for the 2021 tax year, and requir[e] them to evenly divide any tax refunds or tax liability." Nataliya filed an objection to Jody's motion, claiming that she believed most of Jody's tax liability "directly

originate[d] from [Jody's] lack of appropriate tax withholdings and early cashing in of retirement funds, of which [she] was unaware." Following a hearing, the court entered an order on April 8, amending the temporary order to remove the requirement that possession of the cats be rotated and requiring that they instead remain in the marital home. The court also denied Jody's motion asking that the parties be required to file jointly for the 2021 tax year.

## 2. Trial and Decree

Trial was held on August 19 and September 28, 2022. The parties' sons testified in camera in the presence of the parties' attorneys. Jody and Nataliya each testified, and over 100 exhibits were received into evidence. On January 11, 2023, the district court entered a decree dissolving the parties' marriage. The court awarded the parties joint legal and physical custody of their sons, with equal parenting time of the youngest son; the oldest son was attending college. Jody was ordered to pay Nataliya $726 per month in child support, and $1,000 per month in alimony for a term of 72 months.

The district court used the date of the parties' separation, March 1, 2022, as the valuation date for the marital estate and divided the parties' property and debts accordingly. We will set forth in our analysis the evidence relevant to each error assigned by Jody in his appeal, along with the district court's decision as to each issue.

## III. ASSIGNMENTS OF ERROR

Jody assigns, reordered, that the district court abused its discretion by (1) awarding alimony to Nataliya, (2) awarding the marital home to Nataliya, (3) failing to set off a portion of the downpayment on the marital home that came from a premarital asset, (4) failing to set off a portion of a retirement account that came from premarital funds, (5) including a portion of Jody's severance in the marital estate, (6) failing to treat a tax liability as a marital debt, and (7) awarding Nataliya possession of the family cats.

## IV. STANDARD OF REVIEW

[1,2] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Doerr v. Doerr*, 306 Neb. 350, 945 N.W.2d 137 (2020). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id*. A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id*.

## V. ANALYSIS

### 1. Alimony

#### (a) Evidence at Trial and District Court's Decision

Jody's employment changed numerous times during the parties' 19-year marriage for job advancement purposes; his field of expertise was in "pharmaceutical operations, quality systems," and "business development." Nataliya testified that Jody's job often required travel. At times, Jody had a commute of 45 minutes to 1 hour 15 minutes or had to stay in a separate state during the week. Jody testified that he "really only traveled two stints of seven months each" and was home every weekend during those periods. Jody's employment changes, at times, required that the parties move to another state. The parties ultimately settled in Omaha, Nebraska, in 2010. Jody's employment continued to change, but the parties remained in Omaha to provide stability for the children. Jody's jobs continued to require travel and long commutes.

Nataliya testified that she obtained her bachelor's and master's degrees in education and music in Ukraine prior to meeting Jody. When she and Jody married, she worked at a mall until she had their oldest son, at which point she stayed home to care for him. She also worked at a hospital as a "per diem" interpreter for a "couple hours here and there." In 2009, she

worked as hospital support staff while Jody was unemployed. She left this job when they moved to another state for Jody's new employment.

According to Nataliya, she had been with her current employer and its predecessor for about 10 years. Her title at the time of trial was "decision support analyst" and her annual salary was "[a]round [$]85- to 87,000." Nataliya chose to take a remote position "[b]ecause it's better for [her] family." The position allowed her to take her sons to school and "just be . . . present for them." Jody said that Nataliya was offered other positions which would have increased her annual salary to "[$]120- to 170,000." However, he stated, Nataliya "chose to stay home all those years." Nataliya acknowledged that she previously had the opportunity to seek a position with higher pay, but she did not pursue the opportunity because it required significant travel and she wanted to be present for the children. She testified that she was primarily responsible for taking care of the children's day-to-day needs. When asked whether she was "making the most [she] possibly [could]," Nataliya responded, "At this time right now, yes." Nataliya requested alimony of $3,500 per month for 108 months.

The district court ordered Jody to pay $1,000 per month in alimony for a term of 72 months, commencing the first day of the month following the entry of the decree.

### (b) Argument on Appeal

Jody claims the district court abused its discretion by awarding Nataliya alimony. He argues that given the facts of this case, the award of alimony "punish[ed] Jody for sacrificing his time with his children in order to attain a better life for them and Nataliya," and Nataliya was rewarded "for not pursuing and taking advantage of opportunities that would have not only benefitted her presently and long term, but the lives of [their] children." Brief for appellant at 40.

[3-7] The law regarding alimony is well established.

> In dividing property and considering alimony upon
> a dissolution of marriage, a court should consider four

factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019). In addition, a court should consider the income and earning capacity of each party and the general equities of the situation. *Id*. Alimony is not a tool to equalize the parties' income, but a disparity of income or potential income might partially justify an alimony award. The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id*.

In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or a just result. *Id*. The ultimate criterion is one of reasonableness. *Id*. An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Id*.

*Seivert v. Alli*, 309 Neb. 246, 266-67, 959 N.W.2d 777, 793 (2021). See, also, Neb. Rev. Stat. § 42-365 (Reissue 2016) (setting forth factors to consider and purpose of alimony award).

In awarding Nataliya alimony, the district court stated that it had considered the factors in § 42-365, as well as "the income and earning capacity of each party and the general equities of this situation." In doing so, it found:

The parties have been married for 19 years. The testimony showed that [Jody] changed employment 13 to 14 times over those 19 years. Some of [Jody's] prior jobs included positions where he spent a significant portion of his time in Louisiana, traveled to Pennsylvania

to work only returning on the weekends, and worked in Iowa.

[Nataliya] worked during the marriage, but took a position that offered her the flexibility to work from home affording her the ability to maintain the parties' household. The testimony at trial reflects that [Nataliya] was almost exclusively responsible for handling the day-to-day needs, activities, doctor appointments, and the like of the minor children during the week. [Jody] alleges that [Nataliya] is underemployed, but the Court finds the testimony of [Nataliya] credible that she is not underemployed at this time. [Nataliya] explained that in 2014 she encountered an opportunity to start a new position making more money, but [Nataliya] testified that the position included a significant amount of travel, which she could not do given the needs of the minor children.

Given all of these factors, the Court determines that the alimony award in this case is reasonable and serves the purpose of alimony as outlined in statute and caselaw.

We can find no abuse of discretion in the district court's assessment supporting its award of alimony to Nataliya. Jody argues that "Nataliya chose to be a homemaker, and later stay-at-home mother to the parties' two minor children until they reached school age." Brief for appellant at 37. He states that "[m]eanwhile, [he] struggled for the family by climbing the employment ladder in order to support and provide a stable lifestyle for them." *Id.* He further argues that "Nataliya has the capacity to improve her already significant income if she so chooses," given that she turned down "opportunities for greater pay of approximately $120-170,000 annually." *Id.* at 38.

[8] Nataliya sacrificed much of her career to care for the children. She did work at various points in time and reentered the workforce about 10 years prior to the divorce. Jody's positions often required that he travel and take long commutes. As such, when Nataliya returned to the workforce,

she chose a position that allowed her significant flexibility to continue caring for the needs of the children. For this reason, she had to hold off on pursuing an employment opportunity that offered a higher salary but required significant travel. Further, the district court found Nataliya's testimony that she was not underemployed at the time of trial to be credible. When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Wright v. Wright*, 29 Neb. App. 787, 961 N.W.2d 834 (2021). We therefore cannot find that the district court abused its discretion in the alimony awarded to Nataliya.

## 2. Marital Home

### (a) Evidence at Trial and District Court's Decision

The stipulated value of the marital home was $500,000. The remaining debt on the home as of March 1, 2022, was $245,136. The existing mortgage was a 15-year loan with an interest rate of 2.375 percent and monthly payments of $2,762.

Nataliya requested that she be awarded the marital home. She had two options for paying the remainder of the mortgage. The first option would be to assume the existing 15-year loan with a 2.375 percent interest rate. This option was contingent upon her qualifying to assume the mortgage and would require that she continue to pay monthly payments of $2,762. Her second option would be to refinance the loan. With that option, she could choose a 30-year mortgage, likely with a higher interest rate, but with smaller monthly payments. Nataliya testified that she had not been preapproved to refinance her loan with her bank. But she claimed she could afford to pay the mortgage because her income was $87,000 per year and she would have approximately $525,000 of the marital estate, based on her proposed division.

Jody had filed pretrial motions requesting that the marital home be sold; however, on the first day of trial, he withdrew his motion and instead requested that he be awarded the home. Jody expressed that he was better equipped financially to maintain the home. He was preapproved to refinance the house, and his finances would allow him to assume the loan under its existing terms. According to Jody, "Nataliya ha[d] never paid the mortgage until just since the temporary order" and he "paid for all of [the] household expenses."

Jody intended to return to the marital home long term and live there with the children. When asked why he previously requested a sale of the marital home, Jody stated that Nataliya could not afford the house and that, at the time, he believed market demand for housing was going to go down because interest rates were rising. When asked whether he was "going to play some dirty trick and . . . get the house and turn around and sell it," he responded, "No," and stated that he intended "to maintain that residence for . . . the long term with [his] boys."

The court awarded the marital home to Nataliya, along with the associated mortgage. The court required that Natalia refinance or take any other action necessary to remove Jody's name from liability on the mortgage within 120 days of the entry of the decree. If Nataliya could not comply with that provision, she was required to sell the marital home and keep the proceeds.

### (b) Argument on Appeal

Jody contends the district court abused its discretion in awarding the marital home to Nataliya. He does not argue that "the award of the marital home to Nataliya caused an inequitable division of the marital value"; rather, he argues that the award "was not reasonable under the facts and circumstances of the parties and thus caused an untenable decision that unfairly deprived [him] of the home." Brief for appellant at 24. He claims that he was better able to "take care of the

financial obligation of the home," *id.*, and that his income is significantly higher than Nataliya's and her expenses exceeded her monthly income.

The district court properly exercised its discretion in awarding the house to Nataliya. Both parties indicated that they wanted the marital home and that they would assume the existing mortgage or refinance it. While it is true that Nataliya's monthly income is less than Jody's, her alimony payments and other assets would assist her in maintaining the marital home. Further, Nataliya had continued living in the home since March 1, 2022, when the parties separated. Meanwhile, Jody twice requested that the court order the sale of the house. It was not until the first day of trial that he withdrew his second motion for sale of the marital home and asked for the home to be awarded to him. The court was within its discretion to evaluate these circumstances and award Nataliya the house. We cannot say that the district court abused its discretion in awarding Nataliya the marital home.

### 3. Equitable Division of Marital Estate

Several of Jody's assigned errors relate to how the district court classified certain property to reach the marital equalization judgment he owes to Nataliya. We first set forth the legal principles guiding our review of these alleged errors.

[9-10] In a dissolution of marriage proceeding, "'[i]f the parties fail to agree upon a property settlement . . . the court shall order an equitable division of the marital estate.'" *Dooling v. Dooling*, 303 Neb. 494, 507, 930 N.W.2d 481, 495 (2019). Under § 42-365, the equitable division of property is a three-step process. See *Dooling v. Dooling, supra*. The first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between

the parties in accordance with the principles contained in § 42-365. *Dooling v. Dooling, supra.* As a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Id.*

[11-16] Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Dooling v. Dooling, supra.* Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. *Id.* Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property. *Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017). Setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists. *Id.* Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. *Id.* But if the separate property remains segregated or is traceable into its product, commingling does not occur. *Id.* The burden of proof rests with the party claiming that property is nonmarital. *Id.*

[17-19] A nonmarital interest in property may be established by credible testimony. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019). "[A] spouse's own testimony can establish a '"tracing link,"' i.e., tracking an asset to a nonmarital source." *Id.* at 364, 934 N.W.2d at 495. See, also, *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). Of course, triers of fact have the right to test the credibility of witnesses by their self-interest and to weigh it against the evidence, or the lack thereof. *Burgardt v. Burgardt, supra.* Evidence not directly contradicted is not necessarily binding on the triers of fact, and may be given no weight where it is inherently improbable, unreasonable, self-contradictory, or inconsistent with facts or circumstances in evidence. *Id.*

[20] While documentary evidence may be more persuasive, it is not absolutely required. *Burgardt v. Burgardt, supra.* However, "a party opting to rely upon his or her testimony alone does so at the risk of nonpersuasion." *Id.* at 365, 934 N.W.2d at 495.

## (a) Downpayment on Marital Home

### (i) Evidence at Trial and District Court's Decision

Prior to the parties' marriage, Jody owned a home in Chazy, New York. He sold the house within months of their marriage and they "took the money from the sale of the Chazy [house], put it in the bank, kept it." He claims to have made $24,000 from that sale which they then "rolled . . . into [their] next house in St. Louis." They made $12,000 when they sold that house and then purchased a house in Vermont and made an additional $3,000 when they sold it. Each time they moved, they "rolled" the equity from the house they sold into the next house they purchased by using those funds as downpayments until they purchased the marital home in Omaha. When they purchased that home, they made a downpayment of $43,287.11, and of that amount, Jody claimed that at least $24,000 came from the sale of his premarital house in Chazy.

Jody offered some documentation to support his testimony. Exhibit 127 is a "Settlement Statement" reflecting the sale of the Chazy property to Jody in December 2001, which predated the marriage. The contract sales price for the property was $74,500. Exhibit 128 is a "County Clerk's Recording Page," recorded in September 2003 (the parties married in April 2003), showing a "TRANSFER TAX" of $374 received for "CONSIDERATION" of $93,500, and an "Indenture" with the same date, regarding Jody's sale of the Chazy house. Exhibit 114 is a "Settlement Statement" reflecting the parties' purchase of the Omaha marital home in September 2010. The contract sales price for the property was $283,000; a $43,287.11 cash payment was applied to the purchase price plus other costs.

The district court concluded, without any explanation, that Jody did not meet his burden of showing that $24,000 of the downpayment on the marital home was premarital.

### (ii) Argument on Appeal

Jody argues that the district court abused its discretion when it declined to set off a portion of the downpayment for the marital home. He argues that "it is overwhelmingly evident that the proceeds from the sale of Jody's premarital real estate in New York are traceable through the use as a down payment on subsequent family homes up to, and including, the Omaha marital home." Brief for appellant at 27. He points out that the court received documentary evidence showing he made $24,746.40 in proceeds from the sale of the Chazy house. He states that he established a tracing link by his own testimony when he described the purchases and sales of homes throughout the marriage. He testified that each time they purchased a new home, they used the initial $24,000 and any new equity from the sale of their last home to purchase their next home. They continued to do this until they purchased the marital home in Omaha.

Jody is correct that a spouse can establish a "'tracing link'" through his own testimony, and while documentary evidence may be more persuasive, it is not absolutely required. See *Brozek v. Brozek*, 292 Neb. 681, 701, 874 N.W.2d 17, 32 (2016). However, as noted previously, a party opting to rely upon his or her testimony alone does so at the risk of nonpersuasion. See *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019). In this case, the documentary evidence establishes that Jody purchased the Chazy property in December 2001 for a contract price of $74,500. He married Nataliya in April 2003 and then sold his premarital property in September 2003. A transfer tax document indicates consideration of $93,500 was paid for that sale. These documents could arguably support $19,000 in primarily premarital equity gained by Jody as a result of this initial sale. However, there is no settlement

statement for the September 2003 sale of the Chazy property to confirm whether any equity was actually paid out to Jody. Jody claimed he was entitled to $24,000 in premarital equity, whereas the documentation, if found sufficiently persuasive, only supported $19,000 in premarital equity from the sale of the Chazy house. And that presumes the sale price was $19,000 greater than the total of any outstanding mortgages or other liens associated with the property.

[21] This is a situation where if the district court had given Jody a premarital set off for $19,000, we likely would not have found that to be an abuse of discretion. Similarly, however, since the district court was not persuaded by the evidence, we cannot say it abused its discretion. As we previously noted, triers of fact have the right to test the credibility of witnesses by their self-interest and to weigh it against the evidence, or the lack thereof. *Burgardt v. Burgardt, supra*. Here, the district court evidently did not find Jody's testimony tracing a portion of the downpayment on the marital home to be credible. An appellate court will consider the fact that the trial court saw and heard the witnesses and observed their demeanor while testifying, and will give great weight to the trial court's judgment as to credibility. *Hamit v. Hamit*, 271 Neb. 659, 715 N.W.2d 512 (2006). As such, we cannot say the court abused its discretion when it did not set off a portion of the value of the marital home as premarital property.

### (b) Retirement Account #4129

#### (i) Evidence at Trial and District Court's Decision

The parties had numerous retirement accounts with the largest in value being an IRA account in Jody's name ending in #4129 (retirement account #4129). Exhibit 79, titled "Defendant's Statement of Assets & Debts," was introduced into evidence as an aid to the court. It listed Jody's values of the parties' various retirement accounts as of March 1, 2022, the separation date. Retirement account #4129 was valued

at \$420,888, but a note on the document reflects that the "[p]remarital portion [was] \$36,666.00," leaving a marital value of \$384,222. Jody asked the court to subtract the premarital portion "off the top of the value" and then allocate the rest of it to him.

Exhibits 81 through 91 were received into evidence to reflect "money that [Jody] owned and had retirement accounts [for] prior to the marriage." The following colloquy then took place between Jody's attorney and Jody regarding the funds in retirement account #4129, which Jody claimed were premarital:

> Q. Okay. And then somehow, some way that money ultimately made it to [retirement account #4129]; is that right?
>
> A. That is correct.
>
> Q. Okay. But as we sit here today you don't have anything showing me the direct funnel step by step, piece by piece going into [retirement account #4129]?
>
> A. No, I do not.
>
> Q. Okay. But, ultimately, it's your position just to show the court you have got funds [that] existed prior to the marriage and, ultimately, \$36,666 of that made it to [retirement account #4129]; is that right?
>
> A. That is correct.

On cross-examination, Jody stated that he "kept these [accounts] separate. And then eventually [he] rolled them all into one." He stated that he did so with each account "at different times." However, he conceded he did not have documentation to show the rollover of these funds into retirement account #4129; "It was 20 years ago almost." Statements from multiple retirement accounts belonging to Jody from 2001 to 2003 were received into evidence; however, as indicated in the course of cross-examination, none of these documents confirmed that these funds were rolled into retirement account #4129.

The district court awarded retirement account #4129 to Jody but did not find any of the funds in the account to be premarital. Also, Jody was directed to transfer $100,000 from that account to Nataliya "by an IRA Rollover" to "equalize the allocation of the retirement funds" and the "division of marital property."

### (ii) Argument on Appeal

Jody claims the district court abused its discretion when it did not set aside $24,430.81 of retirement account #4129 as premarital property. He points out that the documentary evidence established the balance of five of his accounts that he had prior to the marriage. He states that the value of those accounts amounted to a total of either $22,076.61 or $24,430.81. He further contends that he traced the funds from those accounts to retirement account #4129 through his testimony.

The documentary evidence Jody provided at trial contradicted his testimony. Jody testified that the five premarital accounts had a value of $36,666. However, in each exhibit introduced to support this assertion, the balance of the accounts was circled, and the total sum of those circled balances is $24,430.81—not $36,666. Jody confirms this by his own calculations on appeal.

Jody contends that his testimony and documentary evidence regarding the funds in retirement account #4129 were uncontroverted. However, as previously explained, evidence not directly contradicted is not necessarily binding on triers of fact, and may be given no weight where it is inherently improbable, unreasonable, self-contradictory, or inconsistent with facts or circumstances in evidence. See *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019). Further, triers of fact have the right to test the credibility of witnesses by their self-interest and to weigh it against the evidence, or the lack thereof. *Id*. The district court did not find Jody's testimony tracing a portion of the funds in retirement account

#4129 to be persuasive. Although the documentary evidence establishes that Jody did in fact own some investments before the marriage, the lack of any documentary evidence that these accounts were rolled into retirement account #4129 leaves open the possibility that they could have been cashed out or rolled into other accounts. And while documentary evidence is not required, it can be more persuasive, and "a party opting to rely upon his or her testimony alone does so at the risk of nonpersuasion." *Id.* at 365, 934 N.W.2d at 495. Accordingly, we cannot say the court abused its discretion when it did not set aside a portion of the funds in retirement account #4129 as premarital.

### (c) Severance Payment

### *(i) Evidence at Trial and District Court's Decision*

In July 2021, Jody began a new job running the "global supply chain" for a "beauty products" company. He worked there until February 7, 2022. Exhibit 49 is a copy of Jody's February 7 separation agreement with that company. Paragraph 5 of that document provides for his "Separation Compensation." It indicates that upon Jody's execution of the agreement, the company "will pay [Jody] a continuation of [Jody's] base rate of pay for a period of twelve (12) weeks according to [the company's] payroll practice paying the amount of [$6,730.77] every two weeks with the total gross severance of [$40,384.62]." Deductions were to be made from the payments, including for federal and state tax withholding, FICA, and "all other deductions required by law and/or authorized in writing by [Jody]." The parties agreed that the net amount of $29,351.70 was paid out in six installments over 12 weeks. Exhibit 50 is an "Earnings Statement" for Jody from the company that reflects that the third installment (net $4,891.95; gross year-to-date "[s]everance" of $20,192.31) was paid on April 1 for a "[p]eriod [b]eginning" on March 13 and a "[p]eriod [e]nding" on March 26.

On March 21, 2022, Jody began new employment with a pharmaceutical company, making $175,000 annually. He stated that he did not receive any pay from his new employment until early April, so he was covering his expenses with the severance payments during that period. He testified that he spent almost $10,000 during that time to "set up [his] apartment." He acknowledged getting "double pay" for a period when he was receiving both the severance payments from his former employment and his paychecks from his new employment. It was Jody's estimation that of the $29,000 net severance pay he received, approximately half was paid to him while he was also being paid by his new employer. Because of that, his position was that only $15,000 should be considered marital property (approximately the total severance amount received when he was also receiving paychecks from his new job).

The district court treated all of Jody's severance payments, net valued at $29,351.70, as marital property awarded to Jody. The only explanation provided was: "The Court treats this as marital property as [Jody] terminated his employment with [the beauty products company] on a date prior to the separation of the parties and the income is a result of [marital] activity."

#### (ii) Argument on Appeal

Jody asserts that "[t]he district court abused its discretion by including [his] severance payment as part of the marital estate." Brief for appellant at 32. He contends that half the severance was used while he was not employed during February and March 2022 and that from those severance payments, he paid household expenses in February and child support and general expenses for the children in February and March. He therefore argues that the first $14,675.85 net pay received in those 2 months should be excluded from the marital estate, while the remaining $14,675.85 that he received once he started receiving paychecks from his new

employment in April could be included in the marital estate. We find some merit to Jody's argument based on evidence supporting that the purpose of the severance agreement was merely to continue Jody's wages for 12 weeks after his employment was terminated, thus serving as a substitute for lost future earnings.

Both parties refer us to *Malin v. Loynachan*, 15 Neb. App. 706, 736 N.W.2d 390 (2007), for this court's discussion of severance pay in that case. This court observed that Nebraska had not yet addressed the issue of how to divide a spouse's severance package in a dissolution action. In reviewing decisions from other states (Connecticut, Minnesota, and Michigan), this court determined that the severance package at issue in that case required looking at what portion of the severance package the spouse earned during the marriage. The trial court in that case determined that $71,000 of the husband's severance package constituted wages and set that amount off separately to the husband; however, this court concluded that part of that severance benefit consisted of both marital and nonmarital property. See *id.* In essence, this court impliedly determined that the purpose of the severance package was to compensate for past work rather than lost future wages.

[22,23] Notably, in *Grigsby v. Grigsby*, 648 N.W.2d 716 (Minn. App. 2002), the Minnesota case referenced in *Malin v. Loynachan, supra*, the Minnesota court looked for guidance on intangible assets as discussed in a treatise. See 2 Grace Ganz Blumberg, Valuation and Distribution of Marital Property § 23.08 (2006). Although the *Grigsby* court discussed a section in that treatise related to personal injury awards, see 2 Blumberg, *supra*, § 23.08, we turn our attention to another section specific to severance pay. See *id.* at § 23.04. That section points out that "[i]n most cases, the ostensible purpose of severance pay is to provide a salary substitute for the worker while he or she searches for a new job." *Id.* at 23-88. "Severance pay presents the same dilemma

posed by disability pay, workers' compensation, and personal injury recoveries earned during the marriage but received after divorce." *Id*. at 23-88 to 23-88.1. Although the right to benefits was earned or acquired during the marriage and therefore suggests a marital property classification, "the purpose of the benefits, which is generally replacement of postdivorce earnings, suggests a separate classification." *Id*. at 23-88.1. Many states have "looked to the purpose of the benefits in order to determine their classification." *Id*. at 23-88.3. If intended as deferred compensation for marital labor, the benefits are marital property; however, if "intended to replace postdivorce earnings, they are classified as the worker's separate property." *Id*. at 23-88.4.

A recent case by the Alaska Supreme Court cites to *Malin v. Loynachan, supra*, for the proposition that while severance pay may be a substitute for lost future earnings, it may also award an employee more money based on the length of prior service and therefore "compensate at least partially for past work." See *Hudson v. Hudson*, 532 P.3d 272, 280 (Alaska 2023). The Alaska court initially pointed out that the classification of severance and bonus pay related to employment during a marriage, but which was received after separation, was an issue of first impression in Alaska. See *id*. It observed that other states deciding this issue looked to the intended purpose of the severance benefit and found that generally when benefits were additional compensation for prior marital services or a replacement for lost marital pension rights, then the benefits were marital property. See *id*. However, when the benefits were compensation for lost postmarital wages, then they were separate property. See *id*. The Alaska court also pointed out that when determining the purpose of severance pay, courts have relied on the language of the agreement or testimony from an employer. It concluded that "this purpose-based analysis aligns with Alaska law, because it classifies severance benefits based on whether they are 'compensation

for marital services' or are intended to replace future, post-divorce earnings." *Id*. at 280.

The Alaska Supreme Court vacated the trial court's determination that the severance and bonus pay at issue in that case was separate property based in part on when the benefits were received. See *Hudson v. Hudson, supra*. It concluded the trial court erred by not examining the purpose of the severance pay at issue in that case. However, the Alaska court also noted that neither the severance agreement nor other related materials were admitted at trial, and therefore, the court suggested that additional testimony or other evidence might be necessary on remand. See, also, *In re Marriage of Bishop*, 46 Wash. App. 198, 204, 729 P.2d 647, 650 (1986) (having determined severance or termination pay was not form of deferred compensation but was primarily intended to alleviate economic fallout from unexpected dismissal, court concluded that severance pay that "simply substitutes for a loss of wages" is "separate or personal property of the dismissed person . . . to which his former spouse has no claim").

[24] Guided by these principles, we conclude that when classifying severance pay as marital or nonmarital, a court should determine the purpose of the severance pay. When severance benefits constitute additional compensation for past work during the marriage or a replacement for lost marital pension rights, then the benefits are marital property. However, when severance benefits are compensation for lost postmarital wages, then they are separate, nonmarital property. In this case, the separation agreement and a copy of the April 1, 2022, paystub reflecting the third severance payment were received into evidence. When the documentary evidence is considered with Jody's testimony, it is evident that the severance pay at issue in this case was not to compensate Jody for his past work efforts, particularly since Jody only commenced working for the company in July 2021. The separation agreement states that its purpose is to "specify the separation compensation" and refers to "a continuation" of Jody's

base rate of pay for a period of 12 weeks. Additionally, the "Earnings Statement" shows that the gross severance pay of $6,730.77 on April 1 was for a 2-week period beginning on March 13 and ending on March 26 (the parties separated on March 1), with all required payroll deductions being withheld. Therefore, the severance payments at issue can only be construed to replace lost future wages for a 12-week period due to an unexpected dismissal and not to compensate for past work or some sort of deferred compensation based on past performance. Further, since most of the lost future wages appear to be for periods of time after the parties separated on March 1, Jody's request to set off only $14,351.70 as nonmarital and to allocate $15,000 of the net severance as marital should have been granted. We therefore conclude that it was an abuse of discretion for the district court not to do so.

### (iii) Modification of Marital
### Equalization Judgment

The district court attributed the entire $29,351.70 net severance pay to Jody as a marital asset. Reducing the marital value of the severance pay to $15,000 results in $14,351.70 less value attributable to Jody's share of the marital estate. Therefore, the marital equalization judgment of $23,062 set forth in the decree shall be reduced by $7,175.85 ($14,351.70 ÷ 2) for a modified marital equalization judgment of $15,886.15 owed by Jody to Nataliya.

### (d) Tax Liability

### (i) Evidence at Trial and
### District Court's Decision

The parties filed their 2021 tax returns separately as directed by the district court in an order entered in April 2022. Nataliya testified that during the pendency of the divorce, she discovered that Jody made withdrawals from a retirement account without her knowledge. Jody acknowledged that he made two separate withdrawals of $25,000 from a retirement account to invest in cryptocurrency in March 2021. He also made a

withdrawal of $16,500 in May 2021 to pay an outstanding income tax liability. Jody claimed that Nataliya was aware of the withdrawals. According to Nataliya, she knew Jody withdrew money to pay their tax liability for 2020, but that she did not know about the two additional $25,000 withdrawals. The withdrawals resulted in increased tax liability for Jody for the year 2021.

The district court did not address the 2021 tax liability in the decree.

*(ii) Argument on Appeal*

Jody contends the district court abused its discretion when it "failed to take into consideration a large tax liability that Jody solely was responsible for due to the parties filing separate tax returns in 2021." Brief for appellant at 42. Nataliya's liability was $3,598, while Jody's was $15,698.

We initially observe that the decree is silent as to the 2021 tax liability for either party. Paragraph 31 of the decree is labeled "PRIOR YEARS TAX RETURNS & REFUNDS." It then states that "neither party shall file amended federal or state tax returns without receiving the written consent of the other party, which consent shall not be unreasonably withheld." Further, since the district court did not include a summarized list of all assets and liabilities with values as allocated between the parties in its decree, we cannot confirm whether the court did in fact exclude this liability or any portion of it when calculating the marital equalization judgment. Regardless, to the extent the court did not credit Jody or Nataliya with their respective 2021 tax liabilities when calculating the marital equalization, we find no abuse of discretion.

Jody argues that the tax liability was "clearly marital as it was a result of a tax on Jody's 2021 income for which he was liable as of January 1, 2022[,] before the parties separated on March 1, 2022." Brief for appellant at 43. Jody claims that his tax liability should be included as a marital debt when determining the marital estate or, alternatively, that both parties' 2021 tax liability be included as marital debt.

[25] It is true that income tax liability incurred during the marriage is one of the accepted costs of producing marital income. See *Meints v. Meints*, 258 Neb. 1017, 608 N.W.2d 564 (2000). Income tax liability should generally be treated as a marital debt. *Id*. However, "equity may not demand the same result if credible evidence establishes that the delinquent tax-paying spouse spent significant funds on nonmarital pursuits." *Id.* at 1024, 608 N.W.2d at 569.

Here, there is no allegation that Jody was delinquent in paying taxes; however, there was evidence that Nataliya was not aware that Jody withdrew $50,000 from a retirement account to purchase cryptocurrency, thus resulting in an unexpected increased tax liability for 2021. Prior to trial, the district court denied Jody's motion asking the court to order the parties to file their taxes jointly for the 2021 tax year, and as previously noted, the decree was silent as to this request.

Even assuming the district court abused its discretion by not factoring in both parties' 2021 tax liabilities when calculating the marital equalization judgment, the small benefit received by Nataliya as a result of not having this debt perfectly equalized does not result in the receipt by Jody of less than one-third of the marital estate. See *Thiltges v. Thiltges*, 247 Neb. 371, 527 N.W.2d 853 (1995) (division of property is not subject to precise mathematical formula, but general rule is to award spouse one-third to one-half of marital estate). As a result, we find no reversible error stemming from this alleged omission.

## 4. Cats

### (a) Evidence at Trial and
### District Court's Decision

The parties had two cats. Nataliya testified that the cats were not "family animals," but the "boys' animals." She stated that one of the children had asked for a cat for his "birthday and Christmas wishes for years" and that they were finally "convinced to a have a cat." They then purchased one of the

cats for him. Jody testified that the cats "weren't [the children's]. They were a part of [their] family." Jody said that he "drove 16 hours . . . to Missouri to pick up" one of the cats. The "cats were part of the family" and he missed them tremendously. Jody believed Nataliya "want[ed] the cats for herself only and d[idn't] want to share them whatsoever." He believed she wanted "to manipulate them so they're with her all the time."

If awarded ownership of the cats, Jody would allow them to visit Nataliya's home. Jody said this arrangement had previously worked for them and that although the cats took "the first day or so . . . to adjust," they eventually "transitioned extremely well." According to Nataliya, it was stressful for the cats to travel in a pet carrier every week. The children offered their observations related to the cats in their testimony, but because their comments do not affect our decision, we will not recount it here.

The district court awarded Nataliya the cats "for the benefit of the minor children" and provided that "[u]pon the children reaching the age of majority, the children shall receive ownership of the cats."

## (b) Argument on Appeal

Jody contends that the district court abused its discretion "by awarding possession of the family cats to Nataliya." Brief for appellant at 40. Jody notes that the parties did not assign a monetary value to the cats, because possession of the cats does not provide a "financial advantage to either party for purposes of division of the marital estate." *Id*. at 41. He argues that "in situations where there isn't a financial consequence, the review and determination based on equity, fairness, and reasonableness, are ever more important." *Id.* He argues that "[e]quity, fairness, and reasonableness would dictate that each party receive one cat." *Id*. at 42.

Jody argues that the evidence at trial did not support Nataliya's claim that the cats belonged to the children.

However, there was conflicting evidence regarding to whom the cats belonged. Jody claimed they belonged to the family as a whole. Nataliya testified that the cats were not "family animals," but the "boys' animals." When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Wright v. Wright*, 29 Neb. App. 787, 961 N.W.2d 834 (2021). As such, we cannot say that the district court abused its discretion regarding the cats.

## VI. CONCLUSION

For the reasons set forth above, we affirm the decision of the district court, as modified.

Affirmed as modified.